Slip Op. 15 - 36

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S. and BORUSAN ISTIKBAL TICARET, | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : Before: R. Kenton Musgrave, Senior Judge <br> : |
| UNITED STATES, | : Court No. 14-00214 <br> : |
| Defendant, | : <br> : |
| and | : <br> : |
| U.S. STEEL CORPORATION, BOOMERANG TUBE LLC, ENERGEX TUBE, TEJAS TUBULAR PRODUCTS, TMK IPSCO, VALLOUREC STAR, L.P., WELDED TUBE USA INC., and MAVERICK TUBE CORPORATION, | : <br> : <br> : <br> : <br> : <br> : |
| Defendant-Intervenors. | : <br> : |

### OPINION AND ORDER

[On USCIT Rule 56.2 motion, countervailing duty investigation remanded to International Trade Administration, U.S. Department of Commerce.]

Dated:  April 22, 2015

*Donald B. Cameron*, *Brady W. Mills*, *Julie C. Mendoza*, *Mary S. Hodgins*, *Rudi W. Planert*, and *Sarah S. Sprinkle*, Morris Manning & Martin, LLP , of Washington DC, for the plaintiffs.

*Melissa M. Devine*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant.  With her on the brief were *Joyce R. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Franklin E. White, Jr.*, Assistant Director.  Of Counsel on the brief was *Scott D. McBride*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*Alan H. Price*, *Adam M. Teslik*, *Lara El-Sabawi*, and *Robert E. DeFrancesco, III*, Wiley Rein, LLP, of Washington DC, for the defendant-intervenor Maverick Tube Corporation.

*Jeffrey D. Gerrish*, *Nathaniel B. Bolin*, and *Robert E. Lighthizer*, Skadden Arps Slate Meagher & Flom, LLP, of Washington DC, for the defendant-intervenor United States Steel Corporation.

*Roger B. Schagrin*, *John W. Bohn*, and *Paul W. Jameson*, Shagrin Associates, of Washington DC, for the defendant-intervenors Boomerang Tube LLC, Energex Tube, Tejas Tubular Products, TMK IPSCO, Vallourec Star, L.P., and Welded Tube USA Inc.

Musgrave, Senior Judge:  Before the court is a challenge to *Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41964 (July 18, 2014), PDoc 369, and accompanying issues and decision memorandum (July 10, 2014) ("*IDM*"), PDoc 363, (collectively "*Final Determination*"), a final affirmative countervailing duty ("CVD") investigation determination conducted by the International Trade Administration, U.S. Department of Commerce ("Commerce"). The period of investigation ("POI") is January 1, 2012, through December 31, 2012.

The plaintiffs[1] challenge these determinations: (1) that Erdemir and its subsidiary Isdemir,[2] suppliers to Borusan of the hot rolled steel ("HRS") input, are statutory "authorities"; (2) that in measuring the "benefit" Borusan received under the statute, the level of government involvement in the Turkish HRS market is so significant that the price of HRS sold in Turkey is significantly distorted, thereby warranting rejection of Borusan's "tier-one" purchases of HRS from domestic and import suppliers; (3) the use of a "tier-two" monthly weighted-average world market

---

[1]  Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Istikbal Ticaret (together "Borusan").

[2]  Erdemir and Isdemir are short for Eregli Demir ve Celik Fabrikalari T.A.S. and Iskenderun Iron & Steel Works Co., respectively.  The plaintiffs refer to them together as "Erdemir."

prices for HRS derived from the Global Trade Atlas ("GTA") maintained by Global Trade Information Services as benchmarks to measure the benefit; (4) that HRS was provided for less than adequate remuneration ("LTAR") to a "limited" number of industries as a matter of fact and was therefore a "specific" subsidy; (5) the application of facts available with an adverse inference for failing to provide information about HRS purchases with respect to two of Borusan's pipe manufacturing facilities in Turkey in two different questionnaires.  For the following reasons, the matter will be remanded for further proceedings.

*Background*

I. The Petition

On July 2, 2013, certain domestic producers ("petitioners") of oil country tubular goods ("OCTGs") filed a petition with Commerce alleging that certain foreign governments including the Republic of Turkey were providing countervailable subsidies to producers and exporters of OCTGs in their respective countries.

The petition explained that HRS is a significant input into the production of OCTGs, and claimed that the Turkish government distorts HRS pricing through several means, including that government's National Restructuring Plan, which by its terms allows the Turkish government to provide subsidies to its HRS industry to increase the competitiveness of that sector and to allow Turkish steel producers using government subsidies to increase production quality, developing product range to high value added products, reducing production costs and improving viability and competitiveness of the sector. PDoc 2 at Vol. X, pp. 4-5. The petition alleged that the result of the

Turkish government's involvement in the HRS market was a reduction across the board within Turkey of HRS prices. *Id*. at 6-7.

The petition also alleged that Erdemir and its subsidiary Isdemir are two of Turkey's largest HRS producers and supply HRS to Borusan of HRS and are owned by Ordu Yardimlasma Kurum ("OYAK"), Turkey's military pension fund, and collectively account for at least 54 percent of the Turkish HRS market.  *Id*. at 9.  The petition alleged that because the Government of Turkey effectively owns Erdemir and Isdemir, and because that government has been completely restructuring the HRS industry in Turkey, it was likely that Turkish OCTG producers have purchased HRS for LTAR for these companies.  *Id* at 3, 8-9.

Commerce subsequently initiated a countervailing duty investigation of OCTGs from Turkey. *Certain Oil Country Tubular Goods from Indian and Turkey*, 78 Fed. Reg. 45502 (July 29, 2013) (initiation). Commerce selected Borusan as one of the mandatory respondents, PDoc 61 at 3, and issued questionnaires to both the Turkish government and Borusan requesting specific information on the provision of HRS in Turkey.

## II.  Questionnaire Responses

On October 31, 2013, Borusan provided its initial questionnaire response.  *See* PDocs 72-75, CDocs 27-38.  Borusan reported that it purchased a significant amount of HRS from Erdemir and Isdemir during the period of investigation, and that, for purposes for use as a benchmark, it was submitting its domestic and imported HRS purchases from private suppliers in each month of the POI.  PDoc 75 at 15.

Commerce requested that Borusan report all of its purchases of HRS during the POI and explained that Borusan should report this purchase information regardless of whether it used the input to produce the subject merchandise during the POI. *Id*. at 10-11. In response, Borusan explained that it had production facilities at three locations: Gemlik, Halkali, and Izmit. *Id*. Borusan stated that only the Gemlik mill produced the subject OCTGs, so it reported HRS purchases for only that mill, as these are the only purchases that could have benefitted from subsidies attributable to the production or sale of the OCTG subject merchandise. *Id*. at 11. Borusan claimed that collecting HRS purchase data for the other mills could impose great burdens on it for no purpose. *Id*. at 11, n.2.

The Turkish government also submitted its response to Commerce's questionnaire, explaining that there are five producers of HRS in Turkey, but that it does not maintain any ownership or management interest in any of those companies, including Isdemir and Erdemir, either directly or through other governmental entities . PDoc 179 at 5. It claimed that Erdemir and Isdemir are both private actors who operate their businesses based on normal commercial considerations and in the best interests of their shareholders. *Id*. at 9. Further, the Turkish government claimed it does not hold any shares in Erdemir and Isdemir and that there is no government proclamation, regulation, decree, opinion, law or policy defining any government objectives with regard to Erdemir and Isdemir. *Id*. According to the Turkish government, the fact that the military pension fund OYAK is a majority shareholder in Erdemir and Isdemir does not render them government authorities. *Id*.

In response to Commerce's request on the industries in Turkey that purchase HRS directly, the Turkish government stated that it did not have such data, but that worldwide, HRS users are construction (50%), automobile (32%), machine (7%), electricity (2%) white appliances (2%),

agriculture (2%), petroleum/gas (3%) and packaging, but that no Turkish industry-specific data was available. *Id*. at 7.

On November 21, 2013, Commerce issued a supplemental questionnaire response to Borusan, which responded on December 5, 2013. PDoc 218 at 8-12. Commerce noted that Borusan had not provided Borusan's purchases of HRS for mills at Halkali and Izmit, pointing to the language from the original questionnaire instructing Borusan to report such purchases even if a mill did not make OCTGs, and specifically requested that Borusan report all of its HRS purchases, including its purchases for the Halkali and Izmit mills. *Id*. at 8. The request encompassed the dates, quantities, and values of all of Borusan's HRS purchases, and stated that if Borusan was unable to provide this information, Borusan should provide an explanation "in detail and the efforts you made to provide it to Commerce." *Id*. Borusan did not provide the HRS purchases for the Halkali and Izmit mills, however. It alleged that the time, burden, and transportation costs in getting such information would be substantial. *Id*. at 8-9. Borusan stated that it wanted to fully cooperate with Commerce but that Commerce's request resulted in an unreasonable burden, and that if Commerce insists on full reporting of all hot-coil purchases from every facility it would provide that information but would require several weeks to do so. *Id*. at 9-11.

### III.  Preliminary Results

On December 23, 2013, Commerce issued its preliminary results, determining that the investigated respondents had *de minimis* calculated margins. PDoc 250. Commerce explained, however, that with respect to its investigation of HRS for LTAR, based on information in the Turkish government's questionnaire response, it intended to request additional information about

OYAK and address this information and this alleged subsidy program in a post-preliminary analysis. PDoc 224 at 20.  On January 31, 2014, Commerce issued the Turkish government a second supplemental questionnaire, asking a series of questions with respect to OYAK's history and structure, to which the Turkish government responded on February 13, 2014. *See* PDoc 308 at 3-9. Among its other responses, the Turkish government explained that OYAK owns 49.29 percent of Erdemir, and also that Erdemir owns 3.08 percent of its own shares. *Id*. at 3.

### IV.  Post-Preliminary Analysis Memorandum, Verification, Briefs, and Hearing

On April 18, 2014, Commerce issued its post-preliminary analysis memorandum. PDoc 327.  Commerce preliminarily determined that the Turkish government has extensive involvement in OYAK and that the government's significant involvement in OYAK extends to Erdemir and Isdemir.  *Id* at 6.  Commerce preliminarily determined that the record evidence indicated that those "public bodies" account for the majority of the total domestic supply of HRS in Turkey, and therefore that the level of government involvement in the market was such that prices would be significantly distorted to use as a benchmark for measuring the benefit.  *Id*. at 9. Commerce thus used a "tier two" world market price as a benchmark to measure the benefit, pursuant to 19 U.S.C. §1677(5)(E) and 19 C.F.R. § 351.511(a)(2)(ii).  Finally, because Borusan twice elected not to provide requested HRS purchase information, both times claiming it would be burdensome to do so, Commerce preliminary determined that it was necessary to apply facts available with an adverse inference pursuant to 19 U.S.C. §1677m(a) and (b).  PDoc 327 at 13.

From April 25, 2014, to May 2, 2014, Commerce verified responses from both the Turkish government and Borusan. *IDM* at 1.  Before verification, the Turkish government requested

that Commerce officials verify the alleged "program" of HRS for LTAR in addition to the program they were already set to verify, but Commerce officials refused, responding that the purpose of verification was to verify facts on the record and not to accept new facts or to hear legal arguments. PDoc 343.  On May 23, 2014, the Turkish government, Borusan, and the petitioners filed their administrative case briefs.  *IDM* at 2.  Two weeks later, on June 13, 2014, Commerce conducted a hearing,[3] in which all of the parties participated. PDoc 359 at 1-3.

## V.  Final Determination

Commerce published the *Final Determination* on July 18, 2014.  In it, Commerce continued to determine that Erdemir and Isdemir were government "authorities" that provided a countervailable financial contribution to Borusan. *IDM* at 20-26, 31-35.  On the issue of verification, Commerce explained that it accepted the accuracy of the information that the Turkish government submitted on its face; therefore, no verification of the alleged HRS for LTAR program was required. *Id.* at 54-55.  Commerce further determined that it would not use Borusan's domestic and import purchases of HRS as benchmarks because "the level of government involvement in the market was such that prices within Turkey would be significantly distorted." *Id.* at 24, 35-39.  In selecting a world market price, purportedly in accordance with 19 C.F.R. §351.511(a)(2)(ii), Commerce rejected prices from data sources on the record that included prices paid in Turkey specifically, and instead used weighted-average monthly prices from the Global Trade Information Systems data source. *Id.*

---

[3]  Borusan sought a writ of mandamus to compel Commerce to conduct verification of the alleged HRS for LTAR program, which action was dismissed a week before the hearing due to lack of subject-matter jurisdiction. *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 38 CIT ___, 986 F. Supp. 2d 1381 (2014).  The claim has apparently since been abandoned. *See infra*.

at 25-26, 39-46.  Commerce continued to find that the number of users of HRS in Turkey are limited and the subsidy was therefore specific, and that the application of facts available with adverse inferences to Borusan as to its unreported HRS purchases was appropriate.  *Id*. at 9-13, 48-52. Commerce calculated a countervailing duty margin for Borusan of 15.58 percent.  *Id*. at 26.

*Jurisdiction and Standard of Review*

The action is brought pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended ("Act"), 19 U.S.C. § 1516a(a)(2)(B)(i).  Borusan has standing under 19 U.S.C. §1516a(d) and 28 U.S.C. §2631(c).

The court reviews whether Commerce's countervailing duty determinations are unsupported by substantial evidence on the record or otherwise not in accordance with law.  19 U.S.C. § 1516a(b)(1)(B)(i).  *See Royal Thai Government v. United States*, 436 F.3d 1330, 1335 (Fed. Cir. 2006) ("*Royal Thai III*").  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) ("*Universal Camera*").

*Discussion*

I.  Whether Erdemir and Isdemir Are
"Authorities" Under 19 U.S.C. §1677(5)(B)

A.  Further Background

Under the CVD law, a "subsidy" occurs when an "authority," *inter alia*, provides a financial contribution "to a person and a benefit is thereby conferred." 19 U.S.C. § 1677(5)(B).  A "benefit" occurs when something is transferred for less than "adequate" remuneration.  Commerce once described "subsidy" to the Court of Appeals for the Federal Circuit as "a device used by

governments to distort the signals that the market gives to firms."  Brief for Appellant at 25, *Georgetown Steel Corp. v. United States*, 801 F.2d 1308 (Fed. Cir. 1986) (No. 85-2805).

Erdemir and Isdemir supplied Borusan with significant amounts of HRS during the period of investigation.  *IDM* at 20.  The provision of HRS for LTAR would be a benefit to Borusan. Therefore, in order to determine whether Borusan as a "person"[4] received a CVD benefit from Erdemir and Isdemir in the form of HRS for LTAR, Commerce had to determine whether those companies are "authorities" within the meaning of the statute.

"Authority" is defined as a country's "government" or any "public entity" within the country's territory.  19 U.S.C. § 1677(5)(B).  Because "public entity" is undefined, Commerce will be accorded *Chevron* deference[5] in a permissible construction of thereof.  *See Guangdong Wireking Housewares & Hardware Co. v. United States*, 37 CIT ___, ___, 900 F. Supp. 2d 1362, 1377 (2013) ("*Wireking*"), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014).

Commerce has not promulgated a regulatory definition of "public entity", but in its *Final Determination*, Commerce concluded that the Turkish government exercises "meaningful control" over Erdemir and Isdemir, and therefore that they are "authorities" under 19 U.S.C. §1677(5)(B).  Specifically, Commerce determined that the Turkish government controls Erdemir and Isdemir through its ownership and control of the military pension fund OYAK and through other means of control.  Commerce explains that under its practice, majority-ownership of an entity by the government creates a rebuttable presumption of government control over that entity.  Def's Resp.

---

[4]  *See*, *e.g.*, 1 U.S.C. §1; 5 U.S.C. §551(2).

[5]  *Chevron v. National Resources Defense Council*, 467 U.S. 837, 843 (1984).

at 12.  *See Wireking*, 37 CIT at ___, 900 F. Supp. 2d at 1377.  Commerce also reasoned that even

when there is little or no formal government ownership, a body may still be considered a "public

entity" within the meaning of the statute if the government exercises "meaningful control" over it.

*See IDM* at 22; PDoc 300 at Ex. 8 (section 129 determination attached to a petitioner's February 5,

2014 comments).  Commerce explains that the inquiry is based upon the totality of the record facts.

*See id.* at 34, 35; PDoc 300 at Ex. 8, p. 5.

Commerce first determined that the Turkish government maintains extensive

involvement in OYAK for several reasons.  *Id.* at 21.  It found that OYAK was created by law in

1961 "as an institution related to the Ministry of National Defense."  *Id.* (citation omitted).  It found

that the Turkish government maintains significant voting rights in OYAK because by statute 17 of

the 40 members of OYAK's "General Assembly" must be government officials (*e.g.*, ministers of

finance and defense).[6]  *Id.* (citations omitted).  It found in Turkish law that the property of OYAK

has the same rights and privileges of state property, that OYAK is exempt from corporate and other

taxes, and that members of the armed forces must contribute part of their salaries to OYAK.  *See id.*

(citations omitted).  Commerce also found significant a TESEV study's conclusion that "a review

---

[6]  The General Assembly elects OYAK's eight-person board of directors. The *Final Determination* also seems to indicate significance from the fact that OYAK's "Representative Assembly" is comprised of 50 to 100 members of the Turkish Armed Forces "designated by their respective commanders or superiors" who in turn elect 20 of the 40 members of OYAK's General Assembly, but Commerce does not explain what, if anything, this has to do, *qua*, with "government" as envisioned in 19 U.S.C. §1677(5)(B).  U.S. Steel argues that according to the Turkish Economic and Social Studies Foundation ("TESEV"), OYAK's members are "agents" of the Turkish government and the Turkish military uses OYAK not only as a pension fund but also as a means to "guide policy", U.S. Steel Resp. at 18, but that goes beyond what is stated in the *IDM*. *See infra.*

of the membership and administrative structure of OYAK reveals that the military is clearly in control." *Id*. (citation omitted).

Next, Commerce found that OYAK owns 49.29 percent of Erdemir through a wholly-owned holding company, and that Erdemir owns 3.08 percent of its own shares as treasury stock. Therefore, Commerce found OYAK holds the majority of Erdemir's outstanding shares (*i.e.*, 49.29/96.08  50.8 percent, net of treasury stock). *Id*. at 20 n.145, referencing CDocs 94-126, PDocs 179-207, at Ex. 4, pp. 4 and 14. Commerce also found that OYAK has members on Erdemir's board of directors, and that OYAK effectively decides the composition of the majority of Erdemir's board through its majority shareholder voting rights in Erdemir. *Id*. at 22 & n.164, referencing Erdemir's articles of association (which state that each shareholder or the representative of the shareholder attending an ordinary or an extraordinary "general assembly" meeting shall have one voting right for each share). Erdemir, in turn, controls Isdemir through its 92.91 percent ownership rights.

Commerce also determined the existence of direct "meaningful control" of Erdemir and Isdemir by the Turkish government. This was in the form, first, of certain usufruct rights (*i.e.,* veto power over any decisions related to the closure, sale, merger, or liquidation of Erdemir and/or Isdemir) held by the Turkish Prime Ministry Privatization Administration (TPA), which oversees the restructuring of Turkey's enterprises, *see id*. at 21, as confirmed in Erdemir's 2012 Annual Report, which indicated that TPA must approve "decisions regarding the closure, limitation upon restriction, or capacity curtailing of any of the integrated steel production plants or the mining plants owned by the Company and/or by the affiliates." *Id*. Second, Erdemir's 2012 Annual Report revealed that OYAK and TPA have members on Erdemir's board of directors and that one of the

board's two auditors is a representative of the Ministry of Finance.  *Id*. at 22.  Third, the 2012

Annual Report indicated that Erdemir had embraced the production and export goals of the Turkish

government's "Medium Term Programme (2012-2014)", which provided that in order to improve

Turkey's balance of payments, the Turkish government would carry on "policies and supports

enhancing domestic production capacity . . . to decrease high dependency of production and exports

on imports, especially for intermediate and capital goods." *Id*. at 21.  That is, the 2012 Annual Report

stated that during the past year Erdemir "implemented policies which promoted the customers to

engage in export-oriented production" and that it "supports the use of domestically mined resources

for raw materials in view of . . . the added value created by the domestic suppliers in favor of the

local industries."  *Id*.  Commerce thus found Erdemir's policy statements "in line" with the Turkish

government's stated policy in the aforementioned "Medium Term Programme" to improve Turkey's

balance of payments.  *Id*.

Accordingly, Commerce determined that the Turkish government exercised

"meaningful control" over Erdemir and Isdemir during the POI and therefore those companies were

public bodies and hence "authorities" pursuant to 19 U.S.C. §1677(5)(B).  *Id*. at 22.

## B.  Analysis

As above indicated, Borusan challenges these conclusions, claiming that the

parameters of "meaningful control" are central to the dispute before the court.  United States Steel

Corporation ("U.S. Steel") and Maverick Tube Corporation ("Maverick") support the *Final*

*Determination* as it is.  The court will attempt, *seriatim*, to address the parties' various contentions.

Borusan's general complaint is that Commerce has not formulated a consistent test for determining whether a company is a "public entity" and does not define what is meant by "meaningful control" or explain how that equates with a finding of a public entity, and that the closest articulation of any standard is simply Commerce's repeated, conclusory statement that the Turkish government exercised "meaningful control" over Erdemir and Isdemir through its ownership thereof by OYAK.  It argues that an undefined "meaningful control" standard is not a reasonable interpretation of the statute and is further unlawful because it merely evidences the potential capacity to act as a government authority, and that there is no substantial evidence of record to support the conclusion that Erdemir and Isdemir are public entities because the statute "at a minimum" requires substantial evidence indicating that a public entity is either "acting as the government or carrying out government functions", neither of which is the case here.  Borusan Br. at 27-29.[7]

---

[7]  Borusan contends this is so, because the Statement of Administrative Action ("*SAA*") accompanying the Uruguay Round Agreements Act, *reprinted in* 1994 *U.S.C.C.A.N.* 3773, provides that "[t]he Administration intends that the term 'entity' in section 771(5)(B)iii) and other sections of the CVD law have the same meaning as the term 'body' in Article 1.1(a)(1)(iv) of the Subsidies Agreement", *SAA* at 925 -- *cf.* 19 U.S.C. § 1677(5)(B) *with* Article 1.1(a)(1) of the Agreement on Subsidies and Countervailing Measures) -- and the Appellate Body of the World Trade Organization ("WTO") has defined "public body" as an entity that "is vested with or exercises governmental authority" and also stated that "evidence of government ownership, in itself, is not evidence of meaningful control of an entity by government and cannot, without more, serve as a basis for establishing that the entity is vested with authority to perform a government function." Appellate Body Report, *United States -- Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*, ¶¶ 345-346, DS379/AB/R (Mar. 21, 2011).  The government responds that cursory substantive arguments in footnotes are deemed waived.  *See, e.g.*, *AK Steel Corp. v. United States*, 215 F.3d 1342 (Fed. Cir. 1999) (at "Unequal Treatment") (citation omitted).  The court does not consider the contention waived, as the plaintiffs attempt elaboration upon it elsewhere, and Commerce itself uses "public entity" and "public body" interchangeably, *see, e.g.*, *IDM* at 22 ("[t]he Department has determined that enterprises with little or no formal government ownership can still be considered *public bodies* if the government exercises meaningful control over them") (italics added), but it is certainly true that WTO Panel and Appellate Body decisions are not binding on the United States or the court.  *Timken Co. v. United States*, 354 F.3d 1334, 1344 (Fed. Cir. 2004).

Commerce argues that this last contention was raised in *Wireking* and rejected, *see* 900 F. Supp. 2d at 1377, and that Borusan's argument should be similarly rejected.  The court agrees Borusan's contention is similarly unsupported, but to be clear, the plaintiffs in *Wireking* had proceeded from Commerce's own five-step formulation, *i.e.*, "where it [is] unclear whether a firm [is] an authority based on ownership information alone," it is "proper" to address the issue by consideration of "(1) government ownership; (2) the government's presence on the entity's board of directors; (3) the government's control over the entity's activities; (4) the entity's pursuit of governmental policies or interests; and (5) whether the entity is created by statute", and from there they claimed that the "actual" issue in that case was "whether an entity exercises elements of government authority".  *Id*. at 1376-78.  *Wireking*'s specific holding addressed the reasonableness of concluding governmental control based on a rebuttable presumption thereof that arose from majority ownership, which the plaintiffs in that case failed to rebut.  That is distinct from the matter at bar, which involves no evidence of direct government ownership, it being undisputed that the Turkish government sold its interest in Erdemir to OYAK in 2006.[8]

Borusan's broader argument puts the reasonableness of a "meaningful control" standard in the crosshairs.  It appears undisputed that Commerce treated OYAK as a public entity by finding "significant involvement" of the Turkish government in OYAK, and that Commerce

_____

[8]  Additionally, Borusan contends that the first part of the *Wireking* test looks at whether the entity is majority owned by the government and argues there is no dispute that the Turkish government has no ownership in Erdemir or OYAK.  CDoc 94 at 4.  Rather, Borusan emphasizes that OYAK, through its subsidiary, Ataer Holdings, purchased its interest in Erdemir using the pension contributions of military personnel, and that OYAK holds the majority interest in Erdemir for the benefit of the pension fund members.  *See* CDoc 118 at Ex. 4-C, p.4, 6; CDoc 94 at 4; PDoc 314 at Article 1. Borusan further emphasizes that the Turkish government provides no funds to OYAK and no governmental funds were involved in OYAK's purchase of Erdemir. PDoc 310 at 2.

treated OYAK's "meaningful control" of Erdemir and Isdemir as government control.  Borusan

therefore accuses Commerce of being "reluctant" to apply the above five-factor test (*see id*. at

1378-79), and that had Commerce done so it would have been "forced" to address the issue of the

role of the Turkish government in Erdemir and Isdemir and to conclude that those companies are not

public entities, because, according to Borusan, all the evidence of record indicates that they are

acting in a commercial manner and seeking to maximize profits.  Borusan Br. at 35-36, referencing

*Certain Hot-Rolled Carbon Steel Flat Products from South Africa*, 66 Fed. Reg. 50412 (Oct. 3,

2001) (final affirmative CVD determ.).

It is debatable whether the five factors outlined in *Wireking* should be construed as

"routine practice" or that Commerce would have altered its conclusion even if had considered each

of them, in particular the test of "presence" as argued by Borusan.  *Cf*. U.S. Steel Resp. at 21-22.

But, Commerce is permitted to depart from routine practice if it provides a reasoned basis for doing

so in any event.  *See*, *e.g.*, *NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir.

2009).  Commerce also references *MTZ Polyfilms, Ltd. v. United States*, 659 F. Supp. 2d 1303, 1308

(2009) for the proposition that bare assertions without legal support should be rejected, and that

Borusan's arguments represent only their philosophical views as to how the legal framework for

subsidy program determinations should operate.  But neither does Commerce elaborate on the legal

framework's operation, except by way of referencing *Certain Kitchen Shelving and Racks from the*

*People's Republic of China,* 74 Fed. Reg. 37012 (July 27, 2009) and accompanying IDM at 43-44

("*Kitchen Racks*"), for the explanation that it does not analyze the five factors for every firm in every

case, and that such analysis can be redundant, where, as here, the Turkish government apparently

controls the makeup of board and management.  *See id*. at 43.

That explanation is not unreasonable as far as it goes.  And while the court agrees

with Borusan that the meaning of "meaningful control" is not well-articulated in this instance, *see*,

*e.g.*, *IDM* at 22 n.165, the court disagrees that it is "merely" conclusory.  Certainly it is a legal

conclusion, but it is one drawn from findings of fact, and the court has been instructed to "uphold

a decision of less than ideal clarity if the agency's path may reasonably be discerned."  *Bowman*

*Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 286 (1974).

Maverick points out that Commerce's analysis, including the five-factor test, has

always focused on the government's position of control over the firm.  Maverick Resp. at 14.

Borusan would seem to agree, for in contesting "meaningful control" here, it points to that standard's

apparent source in this proceeding for guidance: an Office of Policy ("OP") memorandum ("OP

Memo"[9]) concerning the section 129 determination on findings of the Appellate Body of the WTO

with respect to certain CVD determinations against various products from the People's Republic of

China ("PRC").  In consideration of the PRC's system of governance and state functions, the OP

---

[9]  *See* Letter from Petitioners to the Department, "Oil Country Tubular Goods from Turkey: Comments on the Government of Turkey's Supplemental Questionnaire Response" (Feb 6, 2014), PDocs 299-304, at Ex. 8 (Memorandum to Paul Piquado, Assistant Secretary for Import Administration, dated May 18, 2012, from Office of Policy, Import Administration, re "*Section 129 Determination of the [CVD] Investigation[s] of Circular Welded Carbon Quality Steel Pipe; Light-Walled Rectangular Pipe and Tube; Laminated Woven Sacks; and Off-the-Road Tires from the People's Republic of China: An Analysis of Public Bodies in the [PRC] in Accordance with the WTO Appellate Body's Findings*" resulting from *United States -- Definitive Anti-Dumping and Countervailing Duties on Certain Products from China*, DS379/AB/R (Mar. 21, 2011)), PDoc 300. U.S. Steel argues that Commerce has found in "numerous prior cases" that commercial entities are public entities if the government exercises "meaningful control" over them, along with citation thereto, *see* U.S. Steel Resp. at 15, but that was not articulated as the basis of the *IDM*'s position.

Memo describes "meaningful control" as "something more than mere 'formal links,' such as majority ownership; rather, it is control related to the possession or exercise of governmental authority and governmental functions." OP Memo at 3. In the OP Memo's final analysis of such matters,

> record evidence indicates that in the Chinese institutional setting, there may be instances in which the government may exercise meaningful control over enterprises in [the PRC] even in the absence of formal government ownership. Such instances justify further inquiry on a case-by-case basis. Examples include situations in which there is a significant [governing political party] or state presence on the board, in management[,] or in the enterprises in the form of a party committee, or alternatively where the enterprise was previously privatized but ties to the government continue to exist or there were restrictions on the nature of the privatization.

*Id*. at 5.

Borusan argues, by implication, that this OP analysis of the Appellate Body's "meaningful control" standard for treating entities without majority government ownership as public bodies should be confined to the context of the PRC economy and the control the PRC government has over entities operating in that country, including a constitutional mandate to uphold the "socialist market economy". Borusan's Reply at 15 n.4, referencing OP Memo at 2-4. *Cf.*, *e.g.*, *Jiangsu Jiasheng Photovoltaic Technology Co., Ltd. v. United States*, 38 CIT ___, ___, 28 F. Supp. 3d 1317, 1338-51 (2014) (governmental control over export pricing decisions). Borusan contends that there is "absolutely no evidence" that the Turkish government exercises the same level of "control" over entities operating in the Turkish "*capitalist*" or competitive market economy as compared with the PRC's "socialist market" economy in accordance with the OPM Memo test. *Id.* (plaintiffs' italics).

It is not appropriate for a reviewing court to make *ex*-record findings, and that will not be done here. Moreover, the court does not agree that cross-country distinctions are necessary

to an understanding of "meaningful" control, governmental or otherwise. "Control" does not mean

one thing in the PRC, and another in Turkey -- or any other country, for that matter. The ordinary

meaning of control is "[t]o exercise restraining or *directing influence* over; to dominate; regulate;

hence, to hold from action; to curb." *See*, *e.g.*, *Gonzales v. Oregon*, 546 U.S. 243, 283 (2006),

quoting *Webster's New International Dictionary* 1954 (2d ed. 1950) (italics added); *B-West Imports,*

*Inc. v. United States*, 75 F.3d 633, 636 (1996) (same). Whether the "meaningful" modifier adds any

significance to "control" is debatable,[10] but control means not only restraint but also action indicative

of direction or influence, and such control, meaningful or lacking, can be determined with respect

to any relational setting, governmental or otherwise, and not only that of a so-called "socialist market

economy", whatever that is supposed to mean.

Borusan points out, correctly, that "meaningful control" is a legal conclusion. *See*

OP Memo at 3. And one might argue, therefore, that "meaningful control" is a flawed concept, since

the "state" of civilization, excluding anarchy, is governance itself, by definition, and a "meaningful

control" net could be far too readily (or "liberally") cast towards nearly every conceivable situation.[11]

---

[10] "Meaningful" means significant, consequential, essential, important, purposeful, relevant, substantial, or useful, and appears to have been employed to distinguish from mere abstract, *pro forma*, courtesy, or trivial control. *See*, *e.g.*, *Johnson v. Commissioner of Internal Revenue*, 78 T.C. 882 (1982); *Hess v. Port Authority Trans-Hudson Corp.*, 513 U.S. 30, 55 (1994); *N.L.R.B. v. Curtin Matheson Scientific, Inc.,* 494 U.S. 775, 800 (1990); *Saxbe v. Washington Post Co.*, 417 U.S. 843, 863 (1974); *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1239 (11th Cir. 2014); *Raphan v. United States*, 759 F.2d 879, 883 (Fed. Cir. 1985); *Bartz v. United States*, 633 F.2d 571, 576 (Ct. Cl. 1980); *Vnuk v. C.I.R.*, 621 F.2d 1318, 1320-1321 (8th Cir. 1980). Review of these and numerous other decisions that have required "meaningful" control in various contexts did not reveal that particular legal contours have been elucidated to make "meaningful" mean anything more than the ordinary meaning of "control".

[11] Some might even argue that in today's overly-intrusive world of "government," finding

(continued...)

Howsoever that may be, "meaningful control" in the types of situations at bar is still, apparently, tethered to the context and purpose of the CVD law -- to counteract actual subsidization.  *See also infra*, section III.  So long as the inquiry and conclusion are applied uniformly, it is not an unreasonable interpretation of the CVD statute in order to effectuate its purpose.  *See*, *e.g.*, *Usinor Sacilor v. United States*, 19 CIT 711, 720-21, 893 F. Supp. 1112, 1124 (1995) ("ITA need only apply a methodology which reasonably effectuates the purpose of the statute") (citation omitted).

The OP Memo formulates "meaningful control" for CVD purposes as "control related to the possession or exercise of governmental authority and governmental functions".  OP Memo at 3.  Necessarily, Commerce implies, that inquiry must proceed case by case and not be limited to consideration of corporeal voting rights and other corporate formalities.  It would involve examination of any relevant and not necessarily quantifiable factors, such as informal or official ties, incentives, off-book obligations, and so forth.  *See id*.  Along those lines, it might not be unreasonable to presume that a governmental official's mere "interest" in the company amounts to the proverbial "800-pound gorilla" in the room, even in the absence of voting rights held on behalf of the government, or that a governmental "presence" may still be felt regardless of whether it is embodied in a particular corporate individual or board member, or that a particular decision by an entity to act pursuant to or in accordance with some governmental edict, directive or influence has the intended effect of furthering the provision of a "benefit" to another entity, a/k/a "redistribution".

---

[11] (...continued)
"meaningful control" over any aspect of a company's operations would be like shooting fish in a barrel.

*See*, *e.g.*, *Jefferson County Pharmaceutical Association v. Abbott Laboratories*, 460 U.S. 150, 158 n.17 (1983).

Apart from the reasonableness of any particular conclusion, the *process* of that examination, in order to determine whether "meaningful control" is at work, cannot be concluded unreasonable.   "Commerce's interpretation of public entities reflects the realities of corporate ownership and control and enables it to detect certain forms of subsidization [that] are not provided directly by the government, but instead pass through private or quasi-private channels." *Wireking*, 900 F. Supp. 2d at 1377.   And the standard of judicial review requires substantial evidence in any case.   Thus, for example, in addition to the other statutory CVD elements, the record must evince indicia on the part of the considered entity of actual action or reaction, not merely the potential therefor, that may reasonably be inferred to have been the consequence of an identifiable governmental influence directed towards the provision of a countervailable LTAR benefit.   If substantial evidence reasonably supports any such conclusion, then the entity may be said to be "possessed" of or "exercised" by the particular governmental authority or function, and amount to an "authority," which "state" of being is not exorcized regardless of whether it acts "in a commercial manner."  *Cf.*, *e.g., In re General Motors Corp.*, 407 B.R. 463, 476-79 (S.D.N.Y. 2009).[12]

---

[12] Borusan also argues that the fact that there are large sophisticated foreign investment funds with an equity stake in the company additionally undermines a finding that the entity's activities are being controlled by the government to carry out government functions.   Even taking the averment of "large sophisticated foreign investment funds" as true, the briefing does not point to record evidence of whether investment in an "authority" would be incompatible with a reasonable investor's decision-making, and the court will not supply reasons therefor.  *Cf. Hynix Semiconductor, Inc. v. United States*, 30 CIT 288, 305, 425 F. Supp. 2d 1287, 1302 (2006) ("*Hynix*") (mere participation of private investors is "minimally probative" of government role in a firm or transaction).

On this point, "I know it when I see it" rulings may seem antithetical to fostering predictability. *Cf. Jacobellis v. State of Ohio*, 378 U.S. 184, 197 (1964) (Stewart, concurring). But then again, "hard and fast" rules, to the extent they introduce rigidity, might not necessarily produce properly probative results either. *See SEC v. Chenery Corp.*, 332 U.S. 194, 202-03 (1947). Time will tell the test's development or abandonment. In the meantime, Borusan attempts to discredit, piece by piece, the evidence Commerce claims supports the overall conclusion that the Turkish government exercises meaningful control over Erdemir and Isdemir. *See generally* Borusan Br. at 29-35. In the end, the arguments fail to demonstrate that substantial evidence does not support Commerce's conclusion.

Initially, Borusan disputes Commerce's conclusion that the Turkish government controlled OYAK. *Id*. at 29-32. Next, Borusan argues that the Turkish government does not control Erdemir, in reliance on the argument that the Turkish government does not control OYAK. *Id*. at 32-35. Borusan portrays OYAK as a largely private actor that is like any other private pension fund operating in the general social security system and which just happens to have majority controlling ownership of the two largest Turkish HRS producers. *Id*. at 31. Borusan argues that (1) although OYAK is related to the Ministry of Defense, it is not acting in its capacity as a government agency, (2) its members of the board of directors are not even drawn from the military or the Turkish government, (3) there are no provisions in the law that OYAK's board decisions are or can be subject to the approval, advice or instructions of the government, (4) OYAK has no duty to carry out any obligations or services for the Turkish government, and (5) OYAK is not a recipient of any share from the Turkish government budget. *Id*. at 30-32.

However, there is substantial evidence of record to support Commerce's OYAK findings, *e.g.*, that OYAK was created as part of the Turkish Ministry of National Defense, that the Turkish government has "extensive" voting rights in OYAK, and that OYAK has the same privileges as state property. *See IDM* at 21.  Commerce also maintains that it considered OYAK's majority ownership of the outstanding shares in Erdemir as part of the record evidence as a whole, including evidence that the Turkish government exerted control over Erdemir directly, in determining that the Turkish government exercises "meaningful control" over Erdemir and Isdemir, *see id.* at 21, 33-34, and it contends Borusan's arguments only proffer an alternative interpretation of the record facts. For example, Commerce observes, Borusan's emphasis on the fact that during the POI three of the nine board positions were held by representatives of OYAK Group companies, with the TPA holding one position, and the remaining five positions being held by others, so that OYAK did not even hold a majority on Erdemir's board during the POI,[13] does not address the *Final Determination*'s reasoning or the record evidence cited to explain how OYAK's majority shareholder position in Erdemir means that it controls the selection of Erdemir's board.  *See IDM* at 34.  Commerce points out that it found, as a factual and legal matter, that OYAK controls the selection of Erdemir's board, regardless of whether Erdemir's Annual Report identified a member as a representative of the Turkish government or OYAK. *Id.*  Commerce further points out that Borusan claims that there is no way that Erdemir can be considered a public entity, because various private companies hold some relatively small amounts of stock, Borusan Br. at 35, but, Commerce furthermore points out, even if Erdemir has other shareholders, OYAK is still the controlling shareholder.

---

[13]  *See* Borusan Br. at 34.

Duly noted.  The court also notes Borusan's contrary portrayal of the TPA's various veto rights, over closures, shutdowns, *et cetera*, as residual.  Borusan Br. at 34.  Borusan's reply states that the TPA's veto power under the privatization law over decisions related to the closure, sale, merger, or liquidation of Erdemir is very explicit, and by its terms limited, and cannot be relied upon to demonstrate control over other activities of Erdemir.  Borusan Reply at 15, referencing CDoc 97 at Articles 21, 22, & 37, and CDoc 94 at 4-5.  Borusan also argues that the other evidence of meaningful control cited by Commerce, namely that the TPA has a member on Erdemir's board of directors and that one of the auditors of the company is a Representative of the Ministry of Finance, *see* Def's Resp. at 14, does not amount to "control," and that there is no evidence that this is likely to result in, or has resulted in, any effect on the activities of Erdemir, nor does it show that "Erdemir possesses or exercises governmental authority or governmental functions".  Commerce, however, rejected Borusan's description of TPA's power, finding that the ultimate veto authority over Erdemir's capacity decisions and other record information demonstrated that the Turkish government exercised "meaningful control" over Erdemir, and that there was no record evidence to support Borusan's claim of limited TPA or OYAK authority with respect to Erdemir.  *IDM* at 31-35.

Borusan's arguments do not address Commerce's reasoning but only ask the court to reweigh the record evidence, which it cannot do.  *See, e.g.*, *Universal Camera*, *supra*, 340 U.S. at 488 ("[t]he substantiality of evidence must take into account whatever in the record fairly detracts from its weight", but on review a "court may [not] displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*").  That is, Borusan's arguments in this regard do not render

Commerce's interpretation of the record "as a whole" unreasonable, and the court cannot substitute a different interpretation thereof. *See id.* Moreover, Borusan's interpretation of the standard applied to Erdemir, expressed in all of its claims, assumes that Commerce was required to find that Erdemir and Isdemir were "acting as" the government or carrying out government functions, but that is not the standard Commerce applied in this instance, and none of Borusan's arguments to this point demonstrate that Commerce's standard is unreasonable or unlawful. *See supra*.

Attempting again, Borusan claims that Commerce "cherry-pick[ed] statements from Erdemir's Annual Report and attribute[d] a meaning to them that conflicts with the statements around them." Borusan Br. at 33-34. Commerce's response to that contention, in the *IDM*, was that "Borusan's claim is simply not true[:]  Erdemir's Annual Report covering the POI states in plain language that Erdemir implemented policies to promote its customers to engage in export-oriented production and supported domestic suppliers in favor of local industries." *IDM* at 34. Borusan here protests: that "even a cursory examination of this 'evidence' undermines its legitimacy and demonstrates that it is indicative of nothing", and that the facts that the Turkish government has a "Medium Term Programme" that seeks to enhance domestic production capacity and discourage imports for state balance-of-payment issues, and that Erdemir wants to encourage more exports by its customers while supporting the use of domestic mined resources, are not substantial evidence of Turkish government control over Erdemir's activities. Borusan Reply at 15-16, referencing Borusan Br. at 33 & n.10.[14]

---

[14]   Borusan again contends that "it [certainly] does not support the conclusion that Erdemir possesses or exercises governmental authority or governmental functions", *id.* but this again does not quite restate the standard Commerce considered appropriate to apply in this instance.

Commerce, however, maintained that the relative commerciality of an act by a government or public entity is not relevant to the "authority" issue, because such a "line of argument conflates the issues of the 'financial contribution' being provided by an authority and 'benefit.'" Def's Resp. at 19-20, quoting *IDM* at 35 (quoting *Kitchen Racks*), and referencing *Wireking*, 37 CIT at ___, 900 F. Supp. 2d at 1378 n.11 (citing *Hynix*, *supra*, 30 CIT at 309, 425 F. Supp. 2d 1287, 1306 (2006)), & *Micron Technology, Inc. v. United States*, 31 CIT 2031, 2036-37, 535 F. Supp. 2d 1336, 1342 (2007). Commerce further explained in the *IDM* as follows:

> If firms with majority government ownership provide loans or goods or services at commercial prices, *i.e.*, act in a commercial manner, then the borrower or purchaser of the good or service receives no benefit. Nonetheless, the loans or goods or service is [*sic*] still being provided by an authority and, thus, constitutes a financial contribution within the meaning of the Act.

*IDM* at 35, quoting *Kitchen Racks*' accompanying issues and decision memorandum at cmt. 4.

Of course, it would be pointless to conclude that an entity is an "authority" if it is also determined that "the borrower or purchaser of the good or service receives no benefit." *See id*. The implication, therefore, is that Borusan must have received a "benefit" through its transactions with Erdemir and Isdemir, despite the absence of finding that those entities were not "act[ing] in a commercial manner". If the concern is that the market can be, or can become, significantly distorted by governmental influence over an entity regardless of the latter's "commercial manner," then there must be some demonstrable evidence on the record from which such distortion may reasonably be inferred or concluded. *See supra*. For that discussion, *see infra*, section II.B.

At this point, although Borusan is generally correct concerning Erdemir's Annual Report statements that correlation is not causation, Commerce found, from the fact that Erdemir's

stated focus upon export-oriented production aligned with the Turkish government's Medium Term

Programme, that it was not unreasonable to interpret this as "additional" evidence that the

government was exerting control over or influencing Erdemir to carry out national policy. *See IDM*

at 21, 34. *Cf. Smith-Corona Group v. United States*, 713 F.2d 1568 (Fed. Cir. 1983) (acceptance of

respondents' post-sale price adjustments calculated with out-of-scope sales figures was reasonable

because proper apportionment reasonably correlated the adjustments to sales of in-scope

merchandise). The court cannot, once again, find Commerce's interpretation, of that correlated

activity, unreasonable or substitute its own interpretation thereof. *Universal Camera*, *supra*, 340

U.S. at 488. Commerce could reasonably conclude that the statements in Erdemir's annual report

are indicia of action or reaction to governmental influence towards policy as reflected in the Medium

Term Programme.

   Be all that as it may, Commerce's position is that in the final analysis the ultimate

question was not whether any one fact, standing alone, indicated that Erdemir and Isdemir are acting

as "authorities" but whether the record evidence "as a whole" supported that determination. *See*

*IDM* at 34. And on that basis, conversely, if any single material aspect of Commerce's determination

is shown unreasonable, then the determination "as a whole" unravels. *See Universal Camera*, 340

U.S. at 488 ("substantiality of evidence must take into account whatever in the record fairly detracts

from its weight"). Here, the court cannot conclude that Commerce has not taken into account

"whatever in the record fairly detracts from [the] weight", *id.*, of its conclusion that the Turkish

government, both through OYAK and directly, exercised meaningful control over Erdemir and

Isdemir during the POI, as the conclusion is supported by "more than a mere scintilla" on each of

the evidentiary elements upon which Commerce relied therefor, which is to say that the evidence is such that a reasonable mind might accept it as adequate to support Commerce's conclusion, and none of Borusan's arguments are sufficient to impugn Commerce's findings. *See, e.g.*, *Suramerica de Aleaciones Laminadas C.A., v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (citation omitted). Although Borusan claims that Commerce's determination was results-oriented, Borusan Br. at 4-5, 8, Borusan provides no substantiating or clear evidence to support its assertion of bias on Commerce's part. *See United States v. Chemical Foundation*, 272 U.S. 1, 14-15 (1926) (presumption of regularity).

That still leaves open the question of what "benefit" Borusan received in dealing with Erdemir, a question to which this opinion now turns, but before doing so, since remand is otherwise required, *infra*, Commerce is encouraged thereat to respond to whether the above interpretation of "meaningful control" is an accurate statement of Commerce's interpretation.

II.  Measuring the "Benefit" Under the CVD Statute

Borusan also challenges the manner in which Commerce measured the "benefit" that was conferred through its dealings with Erdemir and Isdemir.

A.  Further Background

The CVD statute specifies that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which [*sic*] is subject to the investigation or review." 19 U.S.C. § 1677(5)(E).  Commerce's regulations set forth a hierarchy, or "tiers", governing how it will determine whether adequate remuneration was paid. *See* 19 C.F.R. §351.511.  Tier one compares

the "government price" paid a respondent "to a market-determined price for the good or service

resulting from actual transactions in the country in question." *Id.*, §351.511(a)(2)(I).  If Commerce

concludes that there is no useable market-determined price with which to make such comparisons,

it resorts to tier two, a comparison of "the government price to a world market price where it is

reasonable to conclude that such price would be available to purchasers in the country in question."

*Id.*, §351.511(a)(2)(ii).[15]   *See, e.g., Wireking, supra*, 900 F. Supp. 2d at 1381 (describing

Commerce's practice).

   Borusan argued during the administrative proceeding for tier one pricing based on the

significant volumes of its purchases of HRS from other domestic HRS suppliers and from import

suppliers.  *See* CDocs 135-136, Ex. 26.  According to Borusan, these constituted approximately 40

percent of its total HRS purchases.   Commerce, however, resorted to tier two pricing after

concluding that the Turkish HRS market was "significantly distorted" by the Turkish government's

"substantial portion" involvement in it and therefore there were no useable market-determined prices

for HRS in Turkey.  *IDM* at 38.

   In that process, Commerce relied on (1) the Turkish government's statements in its

questionnaire responses that Erdemir and Isdemir account for the "majority" of HRS production in

Turkey, (2) import statistics for hot rolled coil during 2010-2012 and additional information placed

on the record indicating that domestic HRS production accounted for a majority of the total supply

of HRS in Turkey (including imports) during the POI and for the two prior years, and (3) the fact that

---

[15] Tier three, not relevant here, comes into play "[i]f there is no world market price available
to purchasers in the country in question," in which case Commerce will "measure the adequacy of
remuneration by assessing whether the government price is consistent with market principles."  19
C.F.R. §351.511(a)(2)(iii).

the market share of domestic production in that total supply of HRS for each of these three years was

higher than the market shares calculated for flat-rolled steel in the post-preliminary analyses.  *See*

*id.* at 22-24.  Commerce determined that "a reasonable conclusion to draw from these facts is that,

at a minimum, Erdemir and Isdemir account for a 'substantial portion of the market.'"  *Id*. at 24 &

n.181, and citing *Preamble; Countervailing Duties; Final Rule*, 63 Fed. Reg. 65348, 65377 (Nov.

25, 1998) ("*Preamble*").  More specifically, in addressing the Turkish government's and Borusan's

arguments that Erdemir's and Isdemir's market share is "well below" 50 percent, albeit for the flat-

rolled steel market, Commerce restated a portion of a passage from the *Preamble*,[16] discussed further

below, and declared that it has found distortion in input markets when government providers

accounted for less than 50 percent of the market for the input.  *IDM* at 37, referencing *Certain*

*Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses From the People's*

*Republic of China*, 75 Fed. Reg. 59212 (Sep. 27, 2010) (final affirm. CVD determ.), and

accompanying issues and decision memorandum.

   At this point in the analysis, Commerce is clearly implying, but does not explicitly

state, that its finding on the Turkish government's "substantial portion of the market" means that the

HRS market is significantly distorted.  In the paragraph following the foregoing, Commerce then

states

  Moreover, to measure accurately the *level* of distortion in the Turkish HRS market,
  we required information on production and consumption of HRS in Turkey.  The

---

[16]  *See IDM* at 37 ("where the Department finds that the government owns or controls the majority *or a substantial portion* of the market for the good or service, the Department will consider such prices to be *significantly distorted* and not an appropriate basis of comparison for determining whether there is a benefit") (first italics in original, second italics added), referencing *Preamble*, 63 Fed. Reg. at 65377.

Turkish government stated that it was unable to provide this information. The Turkish government only provided production and consumption information for flat-rolled steel products.

We acknowledge that we are basing our finding on the share of imports into the Turkish HRS market on two sources which may, or may not, be reported on identical bases: import statistics and production data.  However, no other data are available on the record. As explained above, the Turkish government only provided production and consumption information for flat-rolled steel products, but was unable to provide more specific production information on HRS. As we also discussed above, record information suggests that production and consumption data for flat-rolled steel may not reflect the HRS market. Therefore, the Department has determined this information indicates that imports of HRS constituted an even lower share of the Turkish HRS market from 2010-2012 than the shares we used for flat-rolled steel products in the post-preliminary analyses.  Moreover, the Turkish government stated that Erdemir and Isdemir account for the majority of HRS production in Turkey. Therefore, we conclude that Erdemir and Isdemir accounted for, at a minimum, a substantial portion of the HRS market in Turkey during the POI.

The GOT and Borusan have provided no further information on the record to allow us to determine the domestic supply of HRS in Turkey as a whole. If the Turkish government does not maintain the information in the form and manner requested, then it is the Turkish government's responsibility to provide information on the administrative record so that the Department can analyze such information and determine a reasonable method to measure the volume of domestic supply of HRS in Turkey. The Turkish government has knowledge of how its agencies and organizations compile and maintain data, while the Department is not privy to such information. Therefore, as directed by section 782(c)(1) of the Act, the responsibility was with the Turkish government, and not the Department, to propose and present alternative data that we could use to analyze the Turkish HRS market. The information in the Petition Supplement, coupled with the import data, combined with the Turkish government's statement that Erdemir and Isdemir account for the majority of HRS production in Turkey, support a conclusion that Erdemir and Isdemir account for at least a substantial portion of the HRS market in Turkey.

*IDM* at 37-38 (italics added; footnote quoting *Preamble, supra,* omitted).  Thus, on the foregoing

basis, Commerce declined to use Borusan's purchase prices of HRS in Turkey to measure the benefit

of the subsidy and resorted to tier two.  *Id.* at 22, 38.

B.  Analysis -- Tier One (market-determined pricing)

On the issue of how to measure the amount of the "benefit", Borusan contests

Commerce's disregard of the information Borusan submitted in support of tier one pricing.  *See*, *e.g.*,

Borusan's Br. at 11.  Borusan complains that what Commerce has done in this matter is apply a "*per*

*se*" rule of market distortion: *id est*, having found that the Turkish government's market portion is

"substantial," Commerce then found the Turkish HRS market "significantly" distorted (*quod erat*

*demonstrandum*).  This, Commerce denies, stating that while it

> normally prefers tier one market prices, when the record evidence demonstrates that
> the government controls a "substantial portion" of the market, the distortion is no
> longer "minimal," and it is, given the record facts, "reasonable to conclude" that the
> prices are "significantly distorted.". . . . Such an analysis is not a "*per se* rule," but
> reflects Commerce's consideration of the record as a whole when determining
> whether the record contains "usable" market-determined prices.

Def's Resp. at 25, referencing[17] *Preamble*, 63 Fed. Reg. at 65377, and *Wire Decking from the*

*People's Republic of China*, 75 Fed. Reg. 32902 (June 10, 2010) (final CVD determ.), and

accompanying issues and decision memorandum ("*Wire Decking from the PRC*") at 56.

The court acknowledges the agency's normal preference for tier one market prices

and its inherent authority to resort to tier two if the condition to do so is met.  The condition that

---

[17] As additional support, the government references: *Royal Thai Government v. United States*, 30 CIT 1072, 1087, 441 F. Supp. 2d 1350, 1365 (2006) ("when measuring the benefit derived from countervailable government intervention, it is inappropriate to use a benchmark that is similarly the product of government intervention") (footnotes and citations omitted); *Wireking*, 900 F. Supp. 2d at 1382 ("the regulations only require Commerce to determine whether the GOC constitutes a substantial portion of the wire rod market, such that Commerce may reasonably conclude that prices are distorted"); *Archer Daniels Midland Co. v. United States*, 37 CIT ___, ___, 917 F. Supp. 2d 1331, 1343-44 (2013) ("*Archer Daniels*") (recognizing Commerce's reliance on the *Preamble* language for its analysis,  finding that the data that prompted Commerce to utilize tier-two prices here was consistent with data in previous cases leading to utilization of tier-two prices, and noting that in *Wireking*, Commerce used tier-two prices when 47.97 percent of domestic production was state-controlled, imports comprised 1.53 percent of the domestic market, and export tariffs were in place ); and *Lumber*, *supra* (at "There are no market-based internal Canadian benchmarks").

must be met for tier two, as indicated in the *Preamble*, is that the record must support reasonably concluding that the market is "significantly" distorted, since it is at that point that prices may no longer be concluded the result of a "competitive" market-pricing mechanism. *See infra*; *see also Wire Decking from the PRC*. At that point, the tier two inquiry arises of necessity, assuming it has properly been determined that there are no market conditions prevailing in the country for the good or service being investigated or reviewed. *See Archer Daniels*, 37 CIT at ___, 917 F. Supp. 2d at 1343. In that sense, tier two may be construed as a determination "in relation to prevailing market conditions" in the country subject to the investigation or review. Analysis as a whole, thus, would not be considered a *per se* determination, so long as it reasonably reflects consideration of the record, as a whole, when determining whether the record contains usable market-determined prices. But, as mentioned, whenever Commerce relies upon a record-as-a-whole justification, if any one aspect of the record is found to be lacking, the determination is thereby undermined.

Borusan's contention appears to be that distortion needs to be examined independently of substantiality (of market share), while Commerce's point appears to be that distortion needs to be examined in the context of substantiality. The court concludes that while Commerce's ruling may have been facially in accordance with the *Preamble* and regulation, as argued by Commerce, it was still *per se* as applied, as argued by Borusan, for the reasons that follow.

The relevant portion of the *Preamble* provides, first,

> While we recognize that government involvement in a market may have some impact on the price of the good or service in that market, such distortion will normally be minimal unless the government provider constitutes a majority or, in certain circumstances, a substantial portion of the market.

*Preamble*, 63 Fed. Reg. at 65377.   Of interest here, apart from the first part of this compound predicate (*i.e.*, recognition), is the clause that equates government involvement with distortion: if that involvement impacts the market's pricing mechanism, then the involvement is distortive.   And that distortion can be minimal, or, implicitly, significant.   If significant, then the normal market pricing mechanism may be presumed to be operating only on the pretense of free competition.

   The latter part of that sentence of the *Preamble* is reasonably clear, in providing that where the governmental provider "constitutes a majority . . . of the market", *i.e.*, the market's share, Commerce will find that the price of the good or service is, *per se*, significantly distorted, *i.e.*, that the price is not a competitive-market price.

   Also, that part is clear in indicating that where the government provides a "substantial portion" of the market, significant distortion will be found "in certain circumstances"[18].

   But, it is entirely unclear what those "certain circumstances" are, and indication thereof is not provided by the *Preamble*'s next sentence:

> Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to the next alternative in the hierarchy.

*Preamble*, 63 Fed. Reg. at 65377.

---

[18] This might be contrasted with Judge Learned Hand's thumb rule of antitrust law, which holds that even where a private actor's market share can be considered "substantial," it is not necessarily market-restraining.  *Cf. United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945) (a market share of over 90 per cent is enough to constitute a monopoly, but "it is doubtful whether sixty or sixty-four percent" is sufficient "and certainly thirty-three per cent is not"), *approved and adopted*, *American Tobacco Co. v. United States*, 328 U.S. 781, 811-14 (1946), *superseded by statute on other grounds*.  But the concern here, of course, is over a "provider's" ability to offer a governmental "favor" or benefit, *e.g.*, below-market prices, not price elevation.

Obviously, Commerce's conclusions in these matters need to be reasonable.  The straightforward reading of the *Preamble* is that a "substantial portion" finding implies "significant distortion" in certain circumstances, and in the absence of clarification of what those "certain circumstances" are, and explanation of why the Turkish HRS market being examined for purposes of this OCTG investigation is one of those, Commerce's finding that the Turkish HRS market is significantly distorted, based solely on its finding that the Turkish government provided a "substantial portion" of it, amounts, as argued by Borusan, to application of a *per se* rule.

As between whether distortion needs to be examined independently of substantiality or in the context of substantiality, either appears to be a correct interpretation of the "next" sentence of the *Preamble*, quoted above.  This is indicated by the explicitly-stated reasonableness of concluding causality between transaction prices and government involvement in the market (*i.e.*, "as a result of") as well as Commerce's "in certain circumstances" caveat in the prior sentence.  Thus, even though Commerce may merit "substantial" deference in the reasonable construction of its own regulations[19], Borusan's argument is not inaccurate as far as it goes.  However, the argument overlooks that Commerce did attempt to obtain data from the Turkish government on HRS production and consumption that was relevant to the distortion question, *i.e.*, its "level", and that the attempt was unsuccessful.

Even still, Borusan appears to be correct in arguing that Commerce's determination is based on no actual record evidence of distortion.  Borusan argues that: there are "(i) zero import duties on HRS imports from EU countries and a duty drawback system that exempts Turkish

---

[19]  *See Fischer S.A. Comercio, Industria and Agricultural v. United States*, 471 Fed. Apex. 892, 895-96 (Fed. Cir. 2012), referencing *Hyatt v. Duads*, 551 F.3d 1307, 1311 (Fed. Cir. 2008).

companies from import duties and VAT from non-EU countries; (ii) imports accounting for over one-third of total domestic supply of HRS; (iii) foreign suppliers selling into the Turkish market consisting of the largest and most sophisticated global HRS suppliers, including ArcelorMittal, Severstal, and U.S. Steel Kosice; and (iv) no dumping cases or other import restrictions on HRS imports into Turkey." Borusan's Br. at 14. *See id.* at 19. But again, the court may not make a finding therefrom that actual distortion did not exist, in contradiction of Commerce.[20] Nonetheless, for Commerce and the defendant intervenors to deny that Commerce has applied a *per se* ruling is rather telling. Maverick argues, alternatively, that a *per se* rule would still be in accordance with law. *See* Maverick Resp. at 25-26. That is not, however, the basis of Commerce's determination or defense here. Apart from contending here that some of Borusan's arguments should be deemed waived or are based on incomplete representations of the administrative record and the administrative determinations,[21] Commerce's analysis only goes so far as to support finding that

---

[20] Obviously, that is beyond the standard of review on this or any such matter, as is the possibility that if the information had been of record, Commerce might have found that the level of distortion is "minimal", notwithstanding its finding of the Turkish government's "substantial portion of the market" involvement. The *Preamble*, at least, does not foreclose that possibility. *See supra*.

[21] As to waiver, the government argues that Borusan did not contend before Commerce that the *IDM*'s analysis "violated" the *Preamble* and cannot do so now, that Borusan's contentions concerning the statute are otherwise too underdeveloped to warrant consideration here, and that its argument that the distortion determination is a result of Commerce "cobbling together" information on the record should also be deemed waived. Def's Resp. at 23-24, referencing Borusan Br. at 16-17 & n.4 & PDoc 348 at 25-36 (case citations omitted). As to Commerce's acceptance of the Turkish government's information "on its face," Commerce contends Borusan offers only "meritless" argument that Commerce's analysis was deficient. Def's Resp. at 24-25, referencing *IDM* at 55. As a result of the court's conclusions, *infra*, Commerce's contentions, if not implicitly or explicitly addressed elsewhere in the opinion, need not be further addressed, except that in passing the court notes that Commerce in its *IDM* only selectively chose what to accept from the Turkish government's response. Commerce did not, for example, accept that government's explanation that
(continued...)

Erdemir and Isdemir account for at least a "substantial portion" of the HRS market in Turkey, and that the Turkish government has some sort of nebulous, but apparently perceivable, "meaningful control" over Erdemir and Isdemir.  From there, the analysis simply leaps, from "substantial portion of the HRS market in Turkey" attributed to the Turkish government, to finding "significant" distortion of that market as a result of a policy to improve Turkey's balance of payments.  *Cf. Preamble* ("[w]here it is reasonable to conclude that actual transaction prices are significantly distorted" *et cetera*).  Commerce does not adequately explain its interpretation of the record that would support that leap, and neither do the defendant intervenors' recitation of "longstanding practice" in this regard.  *See, e.g.,* Maverick Resp. at 22-25, U.S. Steel Resp. at 24, and  referenced administrative determinations.

Yet, in offering that it was unable "to measure accurately the level of distortion in the Turkish HRS market" based on the information of record, Commerce thereby implies that the level of measurable distortion may either be of significance or of insignificance (*i.e.*, "minimal";  *cf. Preamble*, *supra*) for purposes of determining whether to rely on tier one pricing.  Commerce gives zero indication in the *IDM* that the finding of "significant distortion" is based on any form of rebuttable presumption, and the fact that Commerce itself stated that it was necessary to measure the "level" of distortion and that it did not have the required information therefor, namely, production

---

[21]  (...continued)

[t]he fact that . . . OYAK . . . is a majority shareholder in Erdemir and Isdemir does not render them government authorities.  Erdemir and Isdemir are neither performing any governmental function nor possess, exercise or are vested with governmental authority.  In such a case, in line with the Appellate Body (AB) rulings Erdemir and Isdemir can't be considered as a public body.

PDoc 179 at 9.

and consumption information of HRS in Turkey, means that the "significant" distortion finding is

*per se* as applied, as Borusan argues.  From the fact that Commerce denies that its ruling is *per se*,

even as applied, the court must conclude this is at least indication that further explanation or analysis

of the record is necessary, in order to explain those circumstances where "substantial portion of the

market" results in minimal distortion and where it results in substantial or significant distortion and

explain its reasoning on its categorization of the matter at bar and the record evidence that supports

it.

The court also notes Commerce's calling attention to the "fact" that "both *Wireking*

and *Archer Daniels* sustained Commerce's distortion analysis in this regard, including its reliance

upon the language in the *Preamble*", Def's Resp. at 26, but that is neither explanation nor accurate,[22]

as both cases involved fact patterns distinguishable from the matter at bar.  And in response to

certain of Borusan's arguments,[23] Commerce also fundamentally argues that the facts that Turkish

---

[22] *Cf.* note 17, *supra*.

[23] *I.e.*, Borusan argues: that Commerce previously recognized that the presence of significant imports into a market can indicate that a market is not distorted; that over one-third of Turkey's domestic supply of HRS was imported between 2010 and 2012 and that such a determination was warranted in this case; and that the record evidence affirmatively demonstrates that the market prices were not distorted.  Borusan Br. at 17-18, *referencing Certain New Pneumatic Off-the-Road Tires From the People's Republic of China*, 73 Fed. Reg. 40480 (July 15, 2008) ("*OTR Tires from the PRC*"); *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59212 (Sep. 27, 2010) (final affirm. CVD determ.), and accompanying IDM at n.64 (referencing *OTR Tires from the PRC* without discussion thereof).  Commerce and Maverick respond that the investigation at bar has a distinctly different fact pattern from *OTR Tires from the PRC*, where there were significant volumes of imports making up a substantial portion of domestic consumption, which diminished the ability of the government to control prices, and on which Commerce concluded that because the PRC imported 75 percent of the natural rubber and 50 percent of the synthetic rubber it consumed, and because there was a lack of other evidence on the record to show that government agencies through other means had control of,

(continued...)

price patterns may mimic those in other markets, and that Turkish prices may occasionally exceed

those in other distorted markets, do not "directly undercut", *id*. at 27, referencing Borusan Br. at 18,

Commerce's findings. But, neither this response nor the *IDM* adequately explains why "significant

portion of the market" necessarily equates to or results in "significant" distortion in this matter, as

mentioned above. And, regarding Borusan's reference to *Husteel Co. v. United States*, 32 CIT 610,

618, 558 F. Supp. 2d 1357, 1364-65 (2008) for the proposition that Commerce cannot simply assert

distortion, *see* Borusan Br. 19-20 n.5, Commerce responds that it did not simply assert distortion but

rather determined that the "totality of the record" demonstrated that the Turkish government's

involvement distorted the HRS market in Turkey, but that is again only conclusory. The *Preamble*

allows for the possibility of a level of "minimal" distortion even where there is "substantial portion"

government involvement, and simply asserting that "significant distortion" was determined from the

"totality of the record" does not explain why or how that determination could have been reached on

the basis of a record that Commerce itself admits was incomplete on the issue of the level of

distortion. *See supra*.

---

[23] (...continued)

or otherwise distorted, those markets, there was no government distortion of the PRC's rubber markets in applying the benchmark hierarchy. Commerce here states that it made clear that its finding in *OTR Tires from the PRC* was based solely on the facts of that particular case, that the larger percentages of inputs considered therein are in contrast to the smaller percentage of HRS that Borusan claims was imported into Turkey, and that even if there are similar levels of import penetration and state-owned enterprise production in other cases, there are other indicators of market distortion that may be appropriate to consider in determining whether domestic prices can serve as an appropriate benchmark. Def's Resp. at 27-28, referencing *OTR Tires from the PRC* accompanying IDM at n.13; *see also* Maverick Resp. at 29. Duly noted here, but Commerce does not explain what those "other indicators" are.

Further explanation[24] from Commerce to address the foregoing is therefore requested.

---

[24] If particular governmental involvement in a market can be characterized as "substantial," the question becomes whether that involvement works "with the grain" of market pricing and produces minimal or insignificant distortion.  Regardless, simply inquiring whether the portion or share of a government's market involvement is "substantial" would not, necessarily, answer whether that involvement is "substantially", in the sense of "substantively", distortive, as the *Preamble* itself implies.  To take the *IDM*'s reliance upon *Certain Softwood Lumber Products from Canada*, 67 Fed. Reg. 15545 (Apr. 2, 2002) (final CVD determ., including accompanying issues and decision memorandum) ("*Lumber*") as an example, in the passage cited from that investigation Commerce explained that

> when the market for a particular good or service *is so dominated by* the presence of the government, the remaining private prices in the country in question cannot be considered to be independent of the government price.  It is impossible to test the government price using another price that is entirely, or almost entirely, dependent upon it.

Quoted in *IDM* at 24 (this court's italics).  If a record shows that to be the case, then it might be reasonable to conclude that "[t]he analysis would become circular because the benchmark price would reflect the very market distortion which the comparison is designed to detect", *see id.*, but "so dominated by" is not the same as "substantial portion," and still begs the question in any event:  *i.e.*, whether, in the absence of information of record necessary to determining the "level" of distortion, it is reasonable to infer that the Turkish HRS market is "so dominated by" the "presence" of the Turkish government, due to its "substantial portion of the HRS market in Turkey," that the remaining "private" prices in Turkey cannot be considered independent of the government price.  The stumpage fees paid to provincial governments to harvest and cut timber that were addressed in *Lumber* are hardly comparable to the commodity at bar, HRS, and insofar as the papers and record here reveal, and as mentioned above, it does not appear that Commerce formulated its substantial-portion-means-significant-distortion proposition as a rebuttable presumption, which would seem to be the only other avenue of sustenance therefor, assuming, *arguendo*, such a presumption would be legally viable.  Maverick's response notes the following quote from *Kitchen Racks*: "because of its substantial market presence, the GOC becomes a price leader, with which private firms are forced to compete".  Maverick Resp. at 22-23, quoting *Kitchen Racks*' IDM at 52.  That was not articulated as the basis of the matter at bar, and the court will not speculate as to what reasonable inferences the record can support.  Further clarification on remand as to all such matters would be of assistance to this proceeding as a whole.

### C.  Analysis -- Tier Two (world market pricing)

Assuming the record is reasonably explained to support a significant distortion finding, the analysis here would turn to consideration of Commerce's selection of a benchmark to measure the benefit Borusan received from the HRS subsidy pursuant to section 19 U.S.C. §1677(5)(E)(iv).  As mentioned, Commerce calculated a data set of weighted-average prices derived from Global Trade Information Services' Global Trade Atlas ("GTA") for each month of the period of investigation, with allowances for import duties, Value Added Tax (VAT), and freight expenses.

### 1.  Further Background

In selecting a world market price, Commerce will "seek" to measure the adequacy of remuneration by comparing the government price to a "world market" price where it is reasonable to conclude that such a price would be available to purchasers in the country in question.  19 C.F.R. §351.511(a)(2)(ii).  Where there is more than one commercially available "world market price," Commerce will average such prices, to the extent practicable, "making due allowance for factors affecting comparability." *Id.*  Such factors include delivery charges and import duties, and these Commerce will include, if not otherwise included, when adjusting "the comparison price to reflect the price that a firm actually paid or would pay if it imported the product".  *See* 19 C.F.R. §351.511(a)(2)(iv).

During the investigation, petitioners placed on the record the above-mentioned world market HRS benchmark prices from the GTA database.  *See* PDoc 166 at 9-12.  Borusan submitted HRS prices reported by "Steel Business Briefing" ("SBB") that pertained to a series of domestic, *ex*-works prices from South Europe and also Black Sea Export free-on-board prices. CDoc 34 at Ex.

12.  For the *Final Determination*, Commerce rejected the SBB South Europe prices as a benchmark on the ground that they are other countries' domestic prices, not export prices, and that it would be unreasonable to conclude that such prices would be available to the purchasers in Turkey as directed by 19 C.F.R. §351.511(a)(2)(ii).  *IDM* at 25, 48.  Commerce also disregarded the SBB Black Sea Export prices because no other validating information was placed on the record about this resource, and because Erdemir is located in Eregli, a city on the Black Sea.  Commerce presumed from that location that the SBB Black Sea Export prices would have included prices stemming from transactions within Turkey, either from domestic purchases or from imports into the country, and Commerce had already rejected such tier one price data under its regulatory hierarchy.  *Id*. at 42.  Commerce therefore determined to use the GTA's HRS prices.  The papers filed with the court seem to indicate Commerce relied on about a quarter of the countries in the GTA dataset as its sample (hereinafter "list").  *Cf*. CDocs 176-177 *with* PDoc 166 (exhibit list).

2.  Analysis -- GTA Data and Shipping Costs

Borusan contests the need for the determination as well as the chosen data.  The parties all apparently agree that HRS is a commodity traded freely and competitively on the global market, but Borusan argues that Commerce's list is not representative of the Turkish market and that Commerce erred in refusing to use its proffered SBB data.  Borusan Br. at 23-24.  Borusan argues its proffered SBB data for the Black Sea and Southern Europe prices best reflect the prices for HRS from countries nearer to Turkey that would have reasonably been procured by Turkish OCTG producers,[25] and they contend that the fact that the data include domestic prices is not relevant

---

[25]  Borusan Br. at 23-24, quoting *Lumber* at "Imports Into Canada" ("[t]he further removed
(continued...)

because there are no import duties on HRS from the European Union.  Borusan Br. at 24.  Borusan's argument, however, is insufficient to impugn the reasonableness of Commerce's inference that EU prices for products sold "solely" in a domestic market are unusable because they are not prices that "would be available" to Turkish importers, *see* 19 C.F.R. § 351.511(a)(2)(ii), as well as Commerce's explanation for rejecting the SBB price data from Southern Europe due to its practice of not using data that include domestic prices, *IDM* at 25, as Borusan's argument only leads to a "fairly conflicting" interpretation of the record.  *Cf. Universal Camera*, *supra*, 340 U.S. at 488.

Borusan also argues Commerce unreasonably rejected the Black Sea export prices that included Turkish export prices.  Borusan Br. at 24.  As mentioned, Commerce stated that it could not use a data set presumed to include Turkish export prices set in a distorted market, and it noted that Erdemir is located in a city on the Black Sea.  *IDM* at 42.  Borusan contends there is no basis in the record for concluding that Turkish *export* prices are distorted.  But, if the Turkish domestic market is in fact significantly distorted, then Commerce's explanation of its inference, drawn from that circumstance, regarding the Black Sea export prices cannot be concluded unreasonable.

Moving on, Borusan contests the one "world market price" that Commerce constructed against it based on the GTA data.  Commerce explains that its list weight-averages GTA's indicated monthly prices, consistent with regulatory requirement, because the prices were

---

[25] (...continued)
a transaction or a price is from the immediate physical, legal, and commercial environment of the in-country purchaser, the less precise a benchmark that transaction price may be on its own").  Commerce responds that the quoted passage from *Lumber* merely explains the reasoning behind its hierarchy and its preference for actual market prices.  That passage speaks for itself, however.  *See infra*.

reported on a uniform basis, and weight-averaging reduced "the potential distortionary effect of any specific transactions (*e.g.*, extremely small transactions) in the data."[26] *IDM* at 48.  That methodology is not contested; what is contested is the inclusion of several of the world market prices in the list that are from countries not "in close proximity to Turkey" and could not have been "reasonably available" to Borusan, as well as the fact that the single "world market price" Commerce constructed against Borusan was hundreds of dollars per ton higher than (and in some months double) the delivered prices for its actual imports from unaffiliated global suppliers, despite the fact that HRS is a commodity. Borusan Br. at 23-24. *Cf.* CDocs 176-177 *with* CDocs 135-136 at Ex. 26.

Commerce argues that simply because prices may originate from far-away countries does not indicate they are "unavailable" to Turkish purchasers and does not prohibit it from using those prices as a benchmark.  It maintains that reliance upon those certain chosen HRS prices from the GTA data is in accordance with practice and merits deference. *See* Def's Resp. at 32, referencing *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 79 Fed. Reg. 54963 (Sep. 15, 2014) (final determ. CVD inv.), and accompanying issues and decision memorandum (at "Provision of

---

[26] Commerce explains that its list provides information on "pricing in an unfettered market" during the investigation "from a maximum amount of data points", so as to further the objective to "derive the most robust benchmarks possible", and that in seeking to approximate a Turkish market without price distortion, given the availability of commodity products like HRS worldwide Commerce "used a broad variety of price points to maximize accuracy." Def's Resp. at 34, referencing *Tianjin Tiancheng Pharm. Co. v. United States*, 366 F. Supp. 2d 1246, 1256 (2005) ("Larger sample sizes are generally preferable when the goal is, as here, to generalize from a sample to a population, because the larger the sample, the less risk run that the sample chosen is extreme or unusual simply by chance", quoting Laurence C. Hamilton, *Data Analysis for Social Scientists*, p. 203 (Duxbury Press, 1996)).

Lignite for LTAR").[27]  A demonstrably unreasonable factual determination would obviously not

merit deference, but also Commerce emphasizes that HRS is a commodity product sold in "the

global marketplace" such as that described by the *Preamble*:

> Paragraph (a)(2)(ii) provides that, if there are no useable market-determined prices
> stemming from actual transactions, we will turn to world market prices that would
> be available to the purchaser.  We will consider whether the market conditions in the
> country are such that it is reasonable to conclude that the purchaser could obtain the
> good or service on the world market.  For example, a European price for electricity
> normally would not be an acceptable comparison price for electricity provided by a
> Latin American government, because electricity from Europe in all likelihood would
> not be available to consumers in Latin America.  However, as another example, the
> world market price for commodity prices, such as certain metals and ores, or for
> certain industrial and electronic goods commonly traded across borders, could be an
> acceptable comparison price for a government-provided good, provided that it is
> reasonable to conclude from record evidence that the purchaser would have access
> to such internationally traded goods.

63 Fed. Reg. at 65377.

---

[27]  Commerce also highlights that other opinions of the court have stated that the agency has
"wide latitude to choose . . . an appropriate benchmark rate", a factual determination.  Def's Resp.
at 32-33, referencing, *inter alia*, *AL Tech Specialty Steel Corp. v. United States*, 28 CIT 1468, 1489
(2004) ("*AL Tech*").  If the point here is that somewhere between "wide" and "appropriate" lies
"accuracy", that is an inaccurate characterization of *AL Tech*, which only went so far as to state that
"[t]he applicable statute, 19 U.S.C. § 1677(5)(E)(iv), grants Commerce wide latitude to choose *from
among several levels of political jurisdiction* in identifying an appropriate benchmark rate."  28 CIT
at 1489 (italics added).  That statement does not mean "wide latitude" over "prevailing market
conditions" that are specifically provided for by statute, "includ[ing] price, quality, availability,
marketability, transportation, and other conditions of purchase or sale."  19 U.S.C. § 1677(5)(E)(iv).
Commerce also references *Archer Daniels Midland Co. v. United States*, 38 CIT ___, ___, 968 F.
Supp. 2d 1269 (2014), for its proposition, but that case is also distinguishable, as it concerned over-
or under-inclusiveness in choosing among Harmonized Tariff System classification levels, the court
there holding that "regulation . . . requires only that the selected benchmarks be comparable", and
that the plaintiff in that case "did not establish evidence sufficient to overcome the deferential
standard of review that applies to Commerce's factual determinations",  968 F. Supp. 2d at 1279,
which is another way of stating that the agency is responsible for fact finding.

There should be no theoretical objection to constructing a theoretical world market price for a commodity. *See, e.g.*, Richard Lipsey and Alec Chrystal, *Economics*, pp. 39-40 (Oxford U. Press, 13th ed. 2015 ).[28]  But, the theory of what "the purchaser would have access to" must still be grounded in the reality of "prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review." 19 U.S.C. § 1677(5)(E)(iv).[29]  If the *Preamble*'s construct is of a hypothetical, profit maximizing and cost avoiding "purchaser", the obvious question that follows is what the purchaser would reasonably *avail* itself of.  Whether that "purchaser" would avail itself of HRS from a distant port depends upon the price differential, including the cost of transportation therefrom as compared with reasonably accessible alternatives,[30] and thus the discernible transport distance between the exporting country's port(s) and the importing country's port(s), and the costs associated therewith, may be considered

---

[28]  "Although all markets are to some extent separated, most are also interrelated. . . . Because markets are interrelated we must treat them as a single interrelated system for many purposes.  *General equilibrium analysis* studies markets as a single interrelated system in which individual demands and suppliers spend on all prices, and what happens in any one market will affect many other markets -- and in principle could affect all other markets."  Richard Lipsey and Alec Chrystal, *Economics*, pp. 39-40.

[29]  Apart from the statute, "theory" could extend to "the purchaser would have access to" HRS from Planet Mars, were an HRS producing and trading colony to be established there.  *Cf. id*.

[30]  *Cf. Peer Bearing Co. v. United States*, 22 CIT 472, 458, 12 F. Supp. 2d 445, 485 (1998) *with Sigma Corp. v. United States*, 24 CIT 97, 86 F. Supp. 2d 1344 (2000) ("*Sigma IV*").  *See, e.g.*, *Economics*, *supra*, pp. 39-40 ("[T]he geographical separation of markets for similar products depends on transport costs.  Products whose transport costs are high relative to their production costs tend to be produced and sold in geographically distinct markets.  Products whose transport costs are low relative to their production costs tend to be sold in what amounts to one world market.  But whatever the transport costs, there will be some price differential at which it will pay someone to buy in the low-priced market and ship to the high-priced one.  Thus, there is always some potential link between geographically distinct markets, even when shipping costs are high.").

indicative of whether "the purchaser would have access to" (and would have availed itself of) a

geographically distant HRS source, as indicated among the GTA data.  *Cf.* PDoc 329, CDocs 175-77

(post-preliminary analysis memorandum for Borusan dated Apr. 18, 2014, calculation attachments).

 Unsurprisingly, Borusan argues there is a limit to the shipping cost that it, or any

reasonable purchaser of HRS, would be willing to incur to cover the export distance to a Turkish

port.[31]  For its part, Commerce's post-preliminary analysis and final "world market price" calculation

memorandum do not indicate any exports to Turkey from any of the countries that made the post-

preliminary or final lists, although Commerce might have filtered out such exports for the purpose

of those calculations.  *Cf. id.*  The record does appear to show, however, that every exporting country

among the calculations exported almost exclusively with neighbors or near-neighbors (*i.e.* only a

handful of wider trades from certain EU countries to China or to the United States appear to be

indicated).  *Cf. id.*

 The foregoing is merely observation, not finding, but it would seem to be indication

of the reasonable extent to which HRS purchasers are willing to go in terms of expense for their

requirements, and, as indicated, Borusan questions including exports from such geographically

---

[31] In this instance, among all the countries selected for inclusion in the "world market price" calculations, over a third appear to have ocean freight distances well in excess of 10,000 kilometers, and the journey to Turkey by sea from several of those countries could take between 21 and 26 days depending upon the port.  If "[t]he further removed a transaction or a price is from the immediate physical, legal, and commercial environment of the in-country purchaser, the less precise a benchmark that transaction price may be *on its own*", *Lumber* at "Imports Into Canada" (italics added), perhaps Commerce could assist the court on remand by explaining why a *collection* of those, amounting in this instance to more than a third of the countries selected in its GTA sample, would provide "greater" precision in approximating "the" world price to which "the purchaser" in Turkey would theoretically agree, especially considering the cost of ocean freight that would necessarily be involved.  *See infra.*

distant countries as "Latin" America and/or East and/or Southeast Asia, as may appear in the list, arguing that the cost of shipping from such distances to Turkey may render the otherwise reasonable procurement of HRS prohibitively expensive to a reasonable profit-maximizing purchaser, even if HRS is a freely traded commodity. On the other hand, Borusan's reported imports of HRS, including those in its proposed company-specific benchmark, would appear to undercut its argument to a degree, *cf.* CDoc 27 at Ex. 9B (seller and/or producer address(es) in the Far East). Further, Turkey appears geographically to be within reasonable shipping range, depending on how that is defined, of at least half of the countries on the list. And as for the geographically far-distant remainder, the fact that the GTA data are reportedly unadjusted export prices means that they would exclude, presumably, the cost of transportation to the country of importation (*i.e.*, Turkey), and thus the inclusion of such countries' export figures as a starting point in the calculation of "the" world market price for HRS cannot be concluded unreasonable *per se*, at least at that point, *cf.*, *e.g.*, U.S. Steel Resp. at 34 (GTA export data comparison table), as at that point "the" average price would still be consistent with the theory of one, grand, global, "world market price".

To the extent that Borusan believed that the GTA data were incomplete or distortive, in accordance with 19 C.F.R. §351.301 it had an opportunity to submit information to "rebut, clarify or correct" the data placed on the record by petitioners during the investigation. *Cf. QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (Commerce must consider all such information). Borusan did not do so, but its objection to including the costs of unreasonable shipping distance, among the other adjustments made in that determination of "the" world market price, *see infra*, could implicate this issue and Commerce's selection of countries for its benchmark.

That is, the greater the shipping distance of a commodity like HRS, the more unreasonable the shipping costs therefor will appear to a hypothetical, rational, profit maximizing purchaser or firm, all other things being equal, *see*, *e.g.*, note 30, *supra*, and therefore including such countries in the benchmark would not result in a margin calculated "as accurately as possible", *Rhone Poulenc v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990), and would require either reconstructing the benchmark to conform with commercial reality, or proposing some other method of removing the distortive effect of overinflated shipping charges from the list, in the absence of a reasonable further explanation for the list as it stands. *See infra.  Cf.*, *e.g.*, *Taian Ziyang Food Co., Ltd. v. United States*, 33 CIT 828, 905, 637 F. Supp. 2d 1093, 1160 (2009) (certain data "not distorted by the aberrant . . . routing" to the United States); *Sigma IV*, 24 CIT at 100-01, 86 F. Supp. 2d at 1347-49.

The court notes in passing that Borusan contests the fact that because Commerce found the Turkish domestic HRS market distorted, it likewise found import prices of HRS into Turkey distorted, such as the prices of those imports Borusan procured into Turkey from Russia and Ukraine for its OCTG production facilities.  Assuming, *arguendo*, substantial evidence supports finding that the "prevailing market conditions" in the domestic market are significantly distorted,[32] that circumstance does not imply, without more, that the prices of any discernable exports from those countries that exported to Turkey (which would include Borusan's foreign providers of HRS) to countries other than Turkey are also distorted.  Since remand is otherwise necessary, Commerce is respectfully requested to briefly explain its consideration of the GTA price data, if any are of record, with respect to the prices of the not-to-Turkey exports of those countries that also actually exported

---

[32]   *See supra. Cf.* 19 U.S.C. § 1677(5)(E)(iv).

to Turkey during the POI, because such prices of HRS from those countries would obviously pertain to product that this record shows was in fact available to "a" Turkish "firm" or purchaser, regardless of whether the actual Turkish import prices therefrom are properly considered, *arguendo*, unreliable for tier one purposes. *Cf.* CDoc 186 at 16. *See infra*. And if on remand Commerce determines that the record does not support determining that the Turkish market was significantly distorted, then the above tier two discussion as well as the remainder of this section II are moot.

### 3.  Analysis -- GTA Data Adjustments

Paragraph (a)(2)(ii) of 19 C.F.R. §351.511 provides that "[w]here there is more than one commercially available world market price, the Secretary will average such prices to the extent practicable, making due allowance for factors affecting comparability."

19 C.F.R. §351.511(a)(2)(iv) then provides:

> In measuring adequate remuneration under paragraph (a)(2)(i) or (a)(2)(ii) of this section, the Secretary will adjust the comparison price to reflect the price that *a firm actually paid or would pay* if it imported the product. This adjustment will include delivery charges and import duties.

19 C.F.R. §351.511(a)(2)(iv) (italics added).

The above paragraph is thus clear in stating that the adjustment applies equally to the calculation of the benchmark under either subsection (a)(2)(i) (tier one) or (a)(2)(ii) (tier two), and this is consistent with the statutory requirement that the adequacy of remuneration be determined in relation to prevailing market conditions.  19 U.S.C. §1677(5)(E). *See, e.g.*, *Essar Steel Ltd. v. United States*, 34 CIT ___, ___, 721 F. Supp. 2d 1285, 1294 (2010) ("*Essar I*"), *aff'd in relevant part*, 678 F.3d 1268 (Fed. Cir. 2012) ("*Essar II*").

a. Import Duties, Delivery Charges, VAT

In this instance, Commerce adjusted the GTA benchmark prices to include, *inter alia*, import duties, delivery charges, and VAT. *IDM* at 25-26. Borusan claims it did not actually incur any of these. *See* Borusan Br. at 24-27. It contends paragraph (a)(2)(iv) must be interpreted and applied consistently, and that there is no legal justification to differentiate from tier one to the extent of completely ignoring its actual production experience in constructing a tier two benchmark. For support, Borusan refers to the undisputed example of using a respondent's actual freight costs when constructing a tier one benchmark, and it argues that the definition of "a firm" in Commerce's regulations bears out its argument, because it is specific to "the" respondent under investigation and is not meant to apply to some "hypothetical" firm. *See* Borusan Br. at 25-26. *Cf.* 19 C.F.R. §351.102(b)(23) (defining "firm" as "*the* recipient of an alleged countervailable subsidy, including any individual, company, partnership, corporation, joint venture, association, organization, or other entity") (italics added) *with* 19 C.F.R. §351.511(a)(2)(iv) ("*a* firm") (italics added).

With regard to Borusan's import duty adjustment contention, Commerce states that it clearly agreed "we should exclude import duties from these prices in the benchmark" and that "for this final determination, we have removed import duties from the benchmark price for export prices from these countries in the data." *IDM* at 46. Commerce otherwise contends Borusan's characterization of 19 C.F.R. §351.511(a)(2) is only partially correct.

Claiming "considerable discretion" in interpreting its own regulations, Commerce argues in any event that Borusan's position conflicts with the plain language of the regulation, to wit, that paragraph (a)(2)(iv) "speaks" to benchmark prices that "a" firm would have paid, not "the" firm

being investigated, that tier one prices are the "actual" prices a firm pays to sell products in Turkey

while tier two prices are those which "a" firm "would pay" if it imported the merchandise into

Turkey, and that had the regulation intended to determine benchmarks based on the identical

experience and prices of the investigated firm, it would have so stated.  Def's Resp. at 42 (citation

omitted).   In particular, Commerce describes *Essar* as explicitly holding that "Commerce's

regulations require only that it be a comparable market-determined price that would be available to

the purchaser[s] in the country at issue" and rejecting the argument that the prices had to be

"identical."   Def's Resp. at 38, quoting *Essar II*, 678 F.3d at 1273-74.   *See* 19 C.F.R.

§351.511(a)(2)(ii); *see also Zhaoqing New Zhongya Aluminum Co. v. United States*, 37 CIT ___,

___, 929 F. Supp. 2d 1324, 1327 (2013).   Commerce thus claims that it was not required under

section 351.511(a)(2)(iv) to adjust the GTA data to account, *inter alia*, for Borusan's specific VAT

or inland freight expenses but could instead look at the VAT and market rates for inland freight that

a typical firm in Turkey would incur.  Def's Resp. at 38, referencing *IDM* at 43.

          Borusan's arguments acknowledge neither *Essar*, which has already rejected similar

contentions,[33] nor certain respects of Commerce's analysis.  *Essar* requires the inclusion of cost

elements that "would be" included in a tier two benchmark, the assumption being that they are costs

that a typical firm would confront when procuring foreign-sourced input.

---

[33]  *See Essar II*, 678 F.3d at 1274 ("[b]oth the statute and the regulation, however, *require* that these [freight and import] costs be added to the benchmark prices), referencing 19 U.S.C. § 1677(5)(E) ("the adequacy of remuneration *shall be determined* in relation to prevailing market conditions . . . includ[ing] price, quality, availability, marketability, transportation, and other conditions of sale") & 19 C.F.R. § 351.511(a)(2)(iv) (the benchmark price "*will include* delivery charges and import duties") (appellate panel's emphasis; this court's bracketing).

With respect to Borusan's claims regarding VAT and inland freight, Commerce notes that recovery of VAT under the inward processing regime was not automatic in Turkey, and only applied to exporters that applied to the program and met certain export requirements.  In other words, according to Commerce, since the VAT was company-specific, it was not an adjustment that would apply under 19 C.F.R. §351.511(a)(2)(iv).  Def's Resp. at 38, referencing *IDM* at 43 & *Stainless Steel from Korea* at 42 (duty drawback was a "condition of sale in Korea").  By contrast, Commerce explains, it did not include duties for imports from countries included in the benchmark that the Turkish Harmonized Tariff Schedule showed are entered into Turkey duty-free, which is not company-specific.  The court concludes the adjustment was lawful and reasonably explained, and Borusan's arguments to the contrary do not persuade otherwise.

Commerce also claims to have adjusted to account for the typical costs that a firm would incur with respect to delivery charges including inland freight "from a Turkish port to the companies' [respondents'] facilities."  *IDM* at 25.  Commerce rejected Borusan's claim that "all imported coil" in Turkey incurred "no additional freight charges," because Borusan cited to no evidence to substantiate such a claim.  *IDM* at 40.  Commerce here contends Borusan does not adequately address its reasoning on the matter.  Def's Resp. at 38, referencing Borusan Br. at 25-27.

In arguing that it did not incur any actual inland delivery charges to its Gemlik facility, the only one that produces subject merchandise, Borusan is, in effect, arguing here for application of the so-called *Sigma* cap, which implicitly describes that a rational profit-maximizer's costs must be those incurred with respect to the actual facility that produces subject merchandise.  *See Sigma Corp. v. United States*, 117 F.3d 1401, 1408 (Fed. Cir. 1997) ("*Sigma III*")

("[r]ealistically, such a manufacturer would minimize its material and freight costs by purchasing imported pig iron if the cost of transportation from the port to the foundry were less than the cost of transportation from the domestic pig iron mill to the foundry"); *see*, *e.g.*, *Shandong Huarong Machinery Co. v. United States*, 31 CIT 30, 35 (2007).  Commerce does not here defend *Essar* to the extent of arguing that "would be" cost incurrence would include those that bear no semblance to a "typical" firm's actual production circumstance, and its adjustments apparently attempt to take some account of Borusan's *actual* production experience.  *Cf. IDM* at 25, *supra* (inland freight "to the companies' facilities").  While there may have been cost associated with transport of the imported HRS from the dock to the Gemlik plant, inland freight is not one that "would be" incurred by such plant.  The court assumes the benchmark would not have been lawfully adjusted to include the inland transport of HRS to non-subject merchandise production plants, and therefore the court does not understand Commerce's reasoning in this regard and requests further explanation on the basis for determining to include inland freight to a facility that was not in fact geographically situated for incurring such a cost.

### b.  Ocean Freight

For its tier two benchmark, Commerce also adjusted its starting figure(s) by adding the cost of ocean freight from the littoral countries on the list,[34] stating that "as long as the ocean freight costs are reflective of market rates for international ocean freight, and representative of the rates an importer -- and not necessarily the respondent specifically -- would have paid, then the prices are appropriate to include in our benchmark." *IDM* at 43.  *See* 19 C.F.R. §351.511(a)(2)(iv).

---

[34] An ocean freight adjustment applied to prices of countries only exporting by rail or road would be absurd, of course.

Commerce determined that because the prices at issue were "for shipping HRS from the countries included in our benchmark to Turkey" they were "appropriate to include in our benchmark." *Id*.

Borusan challenges this, arguing that Commerce disregarded evidence demonstrating that its HRS purchases are transported using a general cargo ship, CDoc 186 at 6-13, and it vigorously contests Commerce's decision to use in its benchmark the unsolicited container freight rates provided by one of the petitioners, *see* PDoc 363 at 25-26, which rates Borusan contends were "exorbitant" and in some instances over two hundred dollars per ton. *See* CDoc 176; PDoc 166 at Ex. 1; PDoc 363 at 25-26. The sum total of this "gerrymandered" benchmark, Borusan argues, is a monthly price per ton grossly in excess of what it actually paid or would have paid -- and also, by implication, what a reasonable HRS purchaser would have paid -- to import HRS. *Cf.* CDocs 194-95 at Attach. 2 (final determ. calc. mem. for Borusan) *with* CDoc 183 at Ex. 1 at 4 (SBB Black Sea prices). Likewise, certain domestic U.S. prices *ex*-works were nearly half that of the benchmark prices used by Commerce. *See* CDoc 126 at Ex. 4-L. In some months, the benchmark is twice as high as the fully delivered prices that Borusan actually paid for imports. *Cf.* CDocs 194-95 at Attach. 2 *with* CDocs 135-36 at Ex. 26.

On the question of adjusting the benchmark for ocean freight, *Essar* would require inclusion therein of the reasonable cost of ocean transport if that is actually a "would be" incurred cost. However, that inclusion can only be to the extent of "reflect[ing] the price that a firm *actually paid* or *would pay* if it imported the product." 19 C.F.R. §351.511(a)(2)(iv) (italics added). *See Preamble*, 63 Fed. Reg. at 65377; *see also*, *e.g.*, *Economics*, *supra*, note 30. The distortive effect of any amount beyond that must be eliminated from the calculation. *Cf. Sigma III*, *supra*.

Borusan's presentment does not persuade that it would not have imported from countries as distant as Singapore or Hong Kong. *Cf.* CDoc 27 at Ex. 9B. Commerce also argues Borusan provided no evidence that Turkish firms could not purchase HRS at the prices reflected in the GTA data. Def's Resp. at 34, referencing *IDM* at 42. U.S. Steel also argues Borusan does not point to any evidence that the cost of shipping HRS by container ship is significantly different than shipping by general cargo ship. U.S. Steel Resp. at 36. That being the case, U.S. Steel should have no objection to the use of either method of freight. Borusan, at any rate, counters it was not required to submit evidence demonstrating that no company in Turkey would incur container freight charges, only evidence that it did not incur these charges, which it claims it provided. *See* Borusan Br. at 25-27. Borusan's point was apparently made in the context of arguing for the exclusion of the ocean freight adjustment in its entirety (*i.e.*, in the context of "[j]ust as Commerce would not include these charges in a tier-one benchmark, it cannot include them in a tier-two benchmark"; Borusan Reply at 13), but the point appears no less apt to a consideration of an arguable excess of the ocean freight adjustment.

Interpreting paragraph 19 C.F.R. §351.511(a)(2)(iv), Commerce not unreasonably makes the distinction that "actually paid" in the language of that paragraph is applicable only to paragraph (a)(2)(ii) (tier one), and that "would pay" is applicable only to paragraph (a)(2)(iii) (tier two). Thereby, the "world market price" that is relevant to a given commodity, including the shipping charges that "a firm actually paid or would pay" for its requirements, must be analyzed from the perspective of "a firm", *i.e.*, a typical, profit-maximizing purchaser. At the same time, however, Borusan is correct, *see supra*, that interpreting those distinctions as mutually exclusive is

unreasonable.  *Cf.* 19 C.F.R. §351.511(a)(2)(iv) *with* 19 C.F.R. §351.102(b)(23) (" 'firm' is used to refer to the recipient of an alleged countervailable subsidy").  In other words, because "a firm" in paragraph (a)(2)(iv) *includes* Borusan, *qua*, as such "a firm" that "would pay" the benchmark price if it imported the product, Borusan's "actual experience" is relevant in determining what such a firm *would pay* in making that determination, unless the evidence for Borusan's "would pay" experience is found atypical.

Commerce does not adequately explain its disregard of Borusan's evidence in that regard, as it did not find that Borusan should not be considered "a firm" that is typical of a profit-maximizing purchaser in Turkey.  Nor has the court been informed, via the parties' papers, of any evidence in the record -- other then Borusan's -- to support the inference of what a typical Turkish HRS user "would pay" and employ as its method of shipping.  Borusan provided evidence for the record of what it actually paid for its chosen method of freight shipping importation and the costs associated therewith shipping, which Commerce verified.  *See* CDocs 183, 186 at 6-13, 16.   And whether it is reasonable to conclude that the overall prices of HRS imported into Turkey were distorted, Commerce does not explain why the inference of governmental "influence" over the Turkish HRS market could have reasonably extended to the pricing of international freight of same to Turkish ports.  Commerce did not, in other words, find that Borusan's shipping costs were aberrant; it only stated that it determined to rely on the petitioners' container rates because the prices at issue were "for shipping HRS from the countries included in our benchmark in Turkey" and were "appropriate to include in our benchmark."  *IDM* at 43.

That does not amount to an explanation of the "factors affecting comparability in the

its selection of the benchmark", *Essar II*, 678 F.3d at 1273-74, and more precisely the comparability

of the shipping costs to which a typical Turkish purchaser (or purchasers) would agree.  An import

benchmark's "comparability" means it must bear a reasonably realistic resemblance to the importing

market's reality or it will not be in accordance with the statute.  *See* 19 U.S.C. § 1677(5)(E)(iv) ("the

adequacy of remuneration shall be determined in relation to prevailing market conditions for the

good or service being provided or the goods being purchased in the country which is subject to the

investigation or review"); *see also Preamble*, 63 Fed. Reg. at 65377.  *Cf. Rhone Poulenc*, *supra*, 899

F.2d at 1191.  Further consideration or explanation to address the foregoing is therefore necessary.

### III.  Determination of HRS for  LTAR to a "Limited" Number of Industries

Pursuant to 19 U.S.C. § 1677(5), a countervailable subsidy must be a subsidy that is

"specific", and the guidelines for that determination are "described in paragraph (5A)."  Subsection

(D) of that paragraph, and in particular subpart (iii) thereof, provides, *inter alia*, that "[w]here there

are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if . . .

[t]he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are

limited in number."  19 U.S.C. § 1677(5A)(D)(iii)(I).  In evaluating that factor, Commerce must

"take into account the extent of diversification of economic activities within the jurisdiction of the

authority providing the subsidy, and the length of time during which the subsidy program has been

in operation."  *See id*.

The Turkish government claimed eight industries consume HRS: "Construction,

Automotive, Machinery & Industrial, Electrical Equipment, Appliances, Agricultural, Oil & Gas,

and Containers & Packing." *IDM* at 22.  In determining that HRS for LTAR constitutes a "specific" Turkish subsidy "by way of Erdemir", Commerce relied upon subsection (D)(iii)(I), above, and recognized that the eight industries identified by the Turkish government "may comprise many companies",  but Commerce took the position that the statute "clearly directs . . . analysis on an industry or enterprise basis" and declared that it was "uncontroverted that the users of HRS in Turkey are, as a matter of fact, limited in number." *Id*. at 49.

Actually, Borusan's complaint controverts that finding.  It argues Commerce should have applied the *SAA*'s "rule of reason . . . to avoid the imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy." *SAA* at 930 (emphasis in original).  Contending that the eight "broad industry groups" that the Turkish government reported as consuming HRS "constitute the entire universe of industries that would ever purchase HRS", Borusan argues the alleged "benefits" of the alleged HRS for LTAR program were generally available to all industries that would ever purchase HRS.  Borusan Br. at 37-38.

Commerce responds that the argument lacks factual and legal support, because the terms of the statute direct Commerce to make its determination on the "number" of enterprises or industries benefitting from a subsidy and by the Turkish government's own responses the number of industries that use HRS is "limited".  Def's Resp. at 40-41.  Commerce contends, further, that the *SAA* does not support Borusan's argument, and that there is no logical comparison between the specificity of the provision of HRS for LTAR to a small group of industries that use HRS in their production processes versus the general applicability of, for example, the type of economy-wide tax

cuts referenced in the *SAA*. *See SAA* at 929.[35]  Commerce also calls attention to the Federal Circuit's

recognition that Commerce is afforded "latitude" in determining "the appropriate method by which

to determine the specificity of benefits conferred by subsidies." *Royal Thai III*, *supra*, 436 F.3d at

1336.

        On this issue, Borusan's arguments do not persuade that Commerce's determination

was erroneous or unreasonable.  The statute directs Commerce to consider the "actual number of

recipients" either on an enterprise basis or an industry basis.  This Commerce did, and it is not the

court's function to substitute a different "fairly conflicting" view of the record.  *Universal Camera*,

*supra*, 340 U.S. at 488.  *See*, *e.g.*, *Certain Steel Products from Belgium*, 58 Fed. Reg. 37273, 37276

(July 9, 1993) (final countervailing duty deter.) (eight industries is "too few users and, therefore . . .

evidence of *de facto* specificity").

## IV. Application of Facts Available with Adverse Inferences

### A.  Further Background

---

[35]    Commerce further points out that the specificity requirement in the statute was implemented to ensure that "government assistance that is both generally available and widely and evenly distributed throughout the jurisdiction of the subsidizing authority is not an actionable subsidy," and "to avoid the imposition of countervailing duties in situations where . . . the benefit of the subsidy is spread throughout an economy." *SAA* at 913, 930.  The *SAA* also explained, "conversely," that "the specificity test was not intended to function as a loophole through which narrowly focused subsidies . . . used by discrete segments of an economy could escape the purview of the [CVD] law" and that "the specificity test was intended to function as a rule of reason." *SAA* at 930.  Described examples of "broadly available and widely used" subsidies included "such things as public highways and bridges, as well as a tax credit for expenditures on capital investment" "available to all industries." *Id*. at 929, citing *Carlisle Tire & Rubber Co. v. United States*, 5 CIT 229, 564 F. Supp. 834 (1983).  *See also*, *e.g.*, *Allegheny Ludlum Corp. v. United States*, 24 CIT 452, 463 n.15, 112 F. Supp. 2d 1141, 1152 n.15 (2000) (listing "police, fire protection, roads and schools" as "subsidies" that benefit society generally "and thus minimally distort trade, if at all") (citation omitted).

Section 1677e(a) of Title 19, United States Code, authorizes a determination on the basis of "facts otherwise available" if (1) necessary information is not available on the record, or (2) a respondent withholds information that has been requested by Commerce, or otherwise fails to provide such information by the deadlines for submission of the information or in the form and manner requested.   19 U.S.C. §1677e(a).  If  "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information", an adverse inference, subject to 19 U.S.C. §1677m(d),  may be used in the selection of facts otherwise available.   19 U.S.C. §1677e(b).

Section 1677m(d) of that same Title 19 provides that if a response to a request for information is noncompliant, the respondent must be promptly informed "of the nature of the deficiency" and to the extent practicable be provided with opportunity to remedy or explain the deficiency in light of the time limits established for the completion of proceeding. 19 U.S.C. §1677m(d).  A "not satisfactory" or untimely submission in response to that opportunity authorizes "disregard" of "all or part of the original and subsequent responses", subject to subsection 1677m(e), which provides that Commerce may not "decline" to consider an interested party's information if it is necessary, timely submitted, verifiable, reliable, useable without "undue difficulties", and the interested party demonstrates that it "acted to the best of its ability in providing the information and meeting the requirements established . . . with respect to the information".[36]  19 U.S.C. §1677m(e).

---

[36]  "The mere failure of a respondent to furnish requested information -- for any reason -- requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." *Nippon Steel Corporation v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003). "[T]he statutory mandate that a respondent act to 'the best of its ability' requires the respondent to do the maximum it is able to do." *Id*. at 1382.

Commerce initially requested that Borusan "report all of your purchases of hot-rolled steel during the POI regardless of whether your company used the input to produce the subject merchandise during the POI."  PDoc 75 at 10-11.  In response, Borusan explained that only one of its three production facilities, Gemlik, produced the subject merchandise and that its other two facilities, at Halkali and Izmit, did not produce subject merchandise.  *See* CDoc. 27 at 11.  Borusan claimed that collecting HRS purchase data for its other mills was not relevant, as those plants did not produce OCTG, and gathering the requested information "would impose great burdens on [Borusan] for no purposes."  *Id.*  Borusan also confirmed that no HRS was transferred from these plants to the Gemlik facility where the subject merchandise was produced.  *Id.*

In a supplemental questionnaire, Commerce noted it had been provided with HRS purchase data related to the Gemlik plant but not HRS purchase data for the Halkali and Izmit mills and that the original questionnaire had requested reporting all such purchases even if a mill did not make OCTGs, and it again requested that information from Borusan.  PDoc 177 at 4-5.  "If you are unable to provide this information, please explain in detail why you cannot provide this information and the efforts you made to provide it to the Department."  *Id.*

In response, Borusan described the difficulties it had experienced to that point simply in order to gather the HRS information that pertained to the only mill that produced subject merchandise, and it asked for permission to be relieved of the burden of having to try to duplicate this process with its other two mills.  *See* CDoc 135 at 8-9.  (Borusan here points out that the data for the Gemlik facility amount to over 300 pages.  *See* CDocs 135-36 at Ex. 26.)  Borusan specifically requested that Commerce take into consideration, pursuant to 19 U.S.C. §1677m(c)(1)

and (2), the burden of reporting this information, and Borusan also stated that if "full-reporting" of

all HRS purchases from each of its facilities is insisted, then Borusan "stands ready to provide with

the understanding that it will require several weeks to do so", but Borusan again expressed "hope[ ]

that it will not be necessary for the Department to impose these additional reporting burdens,

particularly given the fact that these other facilities do not produce OCTG and did not transfer [HRS]

to the Gemlik ERW plant where the subject merchandise is produced."  CDoc 135 at 10-11.

Borsuan heard nothing further from Commerce on the subject of reporting HRS data

for the Halkali and Izmit facilities.  Eighteen days after Borusan had submitted its supplemental

questionnaire response, Commerce issued preliminary results indicating *de minimis* margins but also

indicating the decision on the HRS for LTAR program was deferred as Commerce intended to ask

further questions of the Turkish government.

For the *Final Determination*, Commerce stated, without elaboration, that "without

this information" on Borusan's HRS purchase data for its Halkali and Izmit mills, "we cannot fully

determine the benefit that Borusan received from each purchase of HRS from Erdemir and Isdemir."

*IDM* at 12.  Commerce therefore determined that it was necessary to rely on facts available, pursuant

to 19 U.S.C. §1677e(a).  *IDM* at 12.  Commerce also determined that because Borusan had twice

withheld the requested information "and never requested an extension to provide this information

in accordance with 19 CFR 351.302(c)," an "adverse inference" was warranted in accordance with

19 U.S.C. §1677e(b). *IDM* at 12.  As an adverse inference applied to the available facts, Commerce

inferred that "Borusan purchased all HRS for the Halkali and Izmit mills at the lowest price on the

record for the Gemlik mill's HRS purchases from Erdemir and Isdemir," using a production ratio

derived from each mill's reported production capacity and the Gemlik mill's purchases of HRS from Erdemir and Isdemir.  *IDM* at 12.  *See also id.* at 26 n.194.

## B.  Analysis

Borusan contends Commerce abused its discretion in drawing an adverse inference from its responses to the demands for HRS purchase data pertaining to facilities that do not produce subject merchandise.  Borusan argues Commerce had an obligation under 19 U.S.C. §1677m(c) to consider Borusan's difficulties in getting the requested data.  Borusan Br. at 41.

Commerce insists that Borusan's actions amount to a "refusal" to provide requested information and that Borusan's own statements are evidence that Borusan did not "do the maximum" it was able to do in providing the requested information.  *See*, *e.g.*,[37] Def's Resp. at 42, referencing PDoc 218 at 8-9 & *IDM* at 51.  Commerce states that it delayed its decision on the HRS for LTAR program in its preliminary determination until it specifically requested "additional information about OYAK" from the Turkish government, and that it did not delay its decision "to yet again request" HRS purchase information from Borusan.  *Id*. at 45, referencing PDoc 224 at 20.  Commerce further states that Borusan never made a formal extension request as required pursuant Commerce's questionnaire and 19 C.F.R. § 351.302(c), *see IDM* at 51, and it argues 19 U.S.C. §1677m(c)(1) only applies if an "interested party, "promptly after receiving a request" explains why it is "unable to

---

[37] For these reasons, Commerce contends Borusan's citation to *Allied-Signal Aerospace Co. v. United States*, 996 F.2d 1185, 1192-93 (Fed. Cir. 1993), *see* Borusan Br. at 43, in which the plaintiff in that case had no ability to respond more completely than it already had done "because it was unable to, not because it refused to", is inapposite.  Commerce further contends that when a respondent "refuses to comply" with "requests" for information, Commerce is "not required to give another formal notice that the complete failure to respond did not comply with the request" before applying adverse inferences.  Def's Resp. at 44, quoting *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002).

submit" the information and gives "suggested alternative forms in which" it can "submit the information."   Commerce further argues Borusan never "promptly" informed the agency of its difficulties but simply and summarily informed Commerce in its first response "that it would not provide the requested information because gathering such data would be difficult, and then provided a much longer refusal and explanation in response to a supplemental questionnaire."  Def's Resp. at 45.   Thus, Commerce argues, it is Borusan, not itself, who did not abide by statutory and regulatory obligations.   And regarding Borusan's argument that HRS purchase information pertaining to the Halkali and Izmit mills is irrelevant, Commerce references *Acciai Speciali Terni S.p.A. v. United States*, 26 CIT 148, 167 (2002) ("*Acciai*") to argue that it is Commerce, not Borusan, that has the discretion to determine which information it deems relevant to its determination. Commerce further implies that application of adverse inferences is appropriate when a respondent engages in "willful non-compliance" with requests for information simply because the respondent considered the information requested irrelevant.  Def's Resp. at 45-46, additionally referencing *PAM, S.p.A. v. United States*, 31 CIT 1008, 1017 (2007).   The defendant-intervenors' briefs support Commerce's determination along the same lines.

The court disagrees that those sweeping generalizations are applicable here.  Both the *Acciai* and *PAM* courts proceeded from the presumption that the information Commerce had requested from the respondents in those cases was necessary to those proceedings.  In *Acciai*, the requested information concerned pre-privatization asset spin-offs and post-privatization sales of shares, and without that information Commerce "determine[d] that the information on the record is too incomplete to serve as a reliable basis for the determination with respect to these transactions."

26 *CIT* at 167 (citation omitted).  In *PAM*, the respondent had omitted home market sales that it

contended were irrelevant because they had been made, that respondent averred, outside the ordinary

course of trade, and the court held Commerce's request for all sales reasonable, even as to those the

respondent believed were excludable, because

> Commerce is thus able to verify that the sales alleged to be excludable were in fact
> made outside the ordinary course of trade.  Commerce would not be able to verify the
> circumstances of the sales and to determine whether those sales should be excluded
> if the respondent failed to report these sales in the first instance.

31 *CIT* at 1017 n.17.

As to why Commerce would have been unable to discover the veracity of the *PAM*

respondent's claim and determine at verification whether those sales were in fact made outside the

ordinary court of trade and otherwise examine the circumstances of those sales and determine

whether those sales were properly excludable, *PAM* provides no further guidance or reference, but

be that as it may, the circumstances before the court are not comparable to either *Acciai* or *PAM*.

As a result of Borusan's original questionnaire response, Commerce was aware of

Borusan's interpretation of what it considered as legally relevant to the investigation.  CDocs 27-28

at 11.  Commerce's supplemental questionnaire provided no explanation of the "nature" of the

deficiency beyond stating the obvious ("You did not . . . report HRS purchases for [the] two other

mills at Halkali and Izmit"), referring Borusan to the language of the original questionnaire ("You

should report this purchase information regardless of whether your company used the input to

produce the subject merchandise during the POI"), and requesting the information again.  Of course,

if the requested information was indeed relevant then Borusan was taking a risk in not providing it,

but that was Borusan's to take, and would be borne out by verification.  *Cf. Essar I*, 34 CIT at ___,

721 F. Supp. 2d at 1299 (respondent "should have produced" information it deemed irrelevant in "the event that Commerce reached a different conclusion").  Here, Commerce attempts to explain in greater detail the "nature of the deficiency", *see* 19 U.S.C. §1677m(d), that it should have condensed for Borusan's understanding in the first place via the supplemental questionnaire, to wit:

> Commerce did indeed need the purchase information from the [Halkali] and Izmit plants before attributing the subsidy.  In accordance with 19 C.F.R. §351.525(b)(5)(i), "[i]f a subsidy is tied to the production or sale of a particular product, [Commerce] will attribute the subsidy only to that product."  A subsidy is "tied" "when the intended use is known to the subsidy giver and so acknowledged prior to or concurrent with the *bestowal* of the subsidy." *Industrial Phosphoric Acid from Israel*, 63 Fed. Reg. 13626, 13630 (Mar. 20, 1998) (final results admin. rev.) (emphasis added).

> Absent evidence of such tying, "attribution is established at the point the subsidy is *bestowed*, not the point at which it is used." *Id*. at 13631 (emphasis added). Commerce "will not trace the use of subsidies through a firm's books and records. Rather we analyze the purpose of the subsidy based on information at the time of bestowal.  "Once the firm receives the funds, it does not matter whether the firm used the government funds, or some of its own funds that were freed up as a result of the subsidy, for the stated purpose or the purpose we evince." *Preamble*, 63 Fed. Reg. 65403.  Commerce's practice "has been to attribute export subsidies to the sales value of exported products and domestic subsidies to *all products sold*." *Id*. (emphasis added).  Thus, whenever the provision of an input for LTAR is alleged in a petition, Commerce's questionnaire requests the purchase information of those inputs, even if the company claims it did not use those inputs, fully or in part, to produce the subject merchandise. Borusan, as a whole, benefitted from the provision of hot rolled steel for LTAR, and there is no record evidence that the provision itself was "tied" only to hot rolled steel used in the production of OCTGs exported to the United States.

> Had Borusan acted to the best of its ability, it would have provided the hot rolled steel purchase data for all of its mills, as requested, and Commerce *would have attributed that subsidy across all of the downstream products Borusan produced using hot rolled steel*. Instead, Borusan twice refused to provide that information, never requesting additional time to collect that data, or otherwise suggesting an alternative to Commerce to the form of data requested.

Def's Resp. at 46-47 (last italics added by court).

In other words, at that point, and assuming the truth of Borusan's claims regarding subject merchandise and non-subject merchandise production survived verification, Commerce's "attribution" would wind up at exactly at the point that Borusan had been making all along to Commerce: that the HRS purchase information for the non-subject-merchandise-producing Halkali and Izmit mills is not relevant to the *attributable* HRS for LTAR in the countervailing duty investigation of *oil country tubular goods* from Turkey, and therefore such information is, strictly and legally speaking, not "necessary" information.  And Commerce offers no reason to explain why the veracity of Borusan's claims regarding its use of HRS for the production of subject and non-subject would not have been uncovered[38] at verification.  *Cf.* PDoc 340 at 6 (tying HRS purchases to accounting records).

Borusan also avers that this is its first experience with Commerce's examination of HRS for LTAR, and that it was not on notice that it would need to report its purchases of HRS to produce non-subject products.  Maverick disputes this neophytic claim, Maverick Resp. at 43, but even apart from the newness of this proceeding, at the time Borusan received the original and supplemental questionnaires, its interpretation of the regulation governing how HRS for LTAR that would "tie in" to subject merchandise[39] does not appear to have been unreasonable, and even now, notwithstanding the defendant's emphasis on the term "bestowal" (as if that explains why the tying requirement does not apply to the present case), Borusan reasonably explains that

---

[38]  *Cf.*, *e.g.*, *Antidumping Manual* (Import Administration, 2009), ch. 15, § II.A. (the two primary objectives of any verification are to verify the accuracy of the data submitted in the response *and verify that relevant data are not omitted from the response*) (italics added).

[39]  *See* 19 C.F.R. § 351.525(b)(5)(i).

there is little doubt that HRS purchased by the non-subject mills and shipped to those non-subject mills is tied to the non-subject product at the time of bestowal. As such, these purchases are legally irrelevant to the calculation of a subsidy for subject OCTG, and Commerce had no lawful basis to apply AFA for these purchases.

Borusan Reply at 19.

That appears to be the case. Commerce's *post hoc* explanation, above, does not undermine or contradict Borusan's interpretation or position, even if it could be considered a curative for an administrative failure to address the issue at the administrative level in the first instance. *But see Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962) (*post hoc* rationalization is unacceptable). The only relevant product for purposes of the investigation would be OCTG produced at Gemlik, which is true regardless of what other products might have been "benefitted" by the alleged HRS for LTAR program. Further, the defendant's selective interpretation of Borusan's questionnaire and supplemental questionnaire responses does not present an accurate picture of the apparent record of Borusan's responses, as those responses informed Commerce not only of why gathering the requested information for HRS purchase information for its Halkali and Izmit mills would be difficult and burdensome, but also evinced Borusan's not-unreasonable belief that such information was not "necessary", *see* 19 U.S.C. §1677e(a), to the purpose of the OCTG investigation, and further presented Borusan's respectful, albeit informal, request to be relieved of Commerce's burdensome demand while still offering to provide the information should Commerce still require it after considering Borusan's explanation. Commerce was well aware that Borusan would have no opportunity under the regulations to present this information unless it was requested, and that Borusan had informed it that gathering HRS purchase information pertaining to its Halkali and Izmit plants would take "several weeks". The obligations to provide a better explanation of the

"nature of the deficiency" including explanation of the reasons why the information is "necessary" and to reasonably attempt to work with respondents and other interested parties trying to abide administrative deadlines in light of the statutory time limits on the conduct of investigations are all part of Commerce's duties of investigation -- as a neutral fact-finding "referee" on such matters -- yet it asked nothing further of Borusan in the four and a half months between Borusan's response and the post-preliminary analysis even after delaying decision on the HRS for LTAR inquiry in order to ask further questions from the Turkish government.

Borusan avers that it believed in good faith that such information should not be required under Commerce's tying regulations, and that because it heard nothing further on the subject after Commerce's preliminary determination, it believed Commerce had agreed with its position on the subject. The court discerns nothing from the record that would contradict that averment. Commerce never addressed this "tying" issue in the *Final Determination*, stating only that "we cannot fully determine the benefit that Borusan received from each purchase of HRS from Erdemir and Isdemir", but that statement does not appear to be true with respect to the benefit that is legally attributable to the subject merchandise. As Borusan argues, HRS purchases that are "tied" to non-subject merchandise cannot be countervailed in consequence of this investigation, and Commerce's mandate in *this* investigation does not include policing the entire Turkish product line that uses HRS in production. The court concludes, therefore, that it appears Commerce has abused its discretion by attributing to all the HRS purchases for the Halkali and Izmit plants the lowest HRS purchase price for the Gemlik plant, and then attributing that impact to all downstream products including subject merchandise. On remand, Commerce has latitude to clarify and persuade that the

HRS purchase information pertaining to the Halkali and Izmit plants was "necessary", but even then, on this record it does not appear that Borusan's was the type of "willful" non-compliance that would merit imposition of an adverse inference. *Cf. Mukand, Ltd. v. United States*, 767 F.3d 1300, 1304, 1306-7 (Fed. Cir. 2014) (regarding "five separate occasions" of requests for certain information in context of administrative review, "[t]he 'best of its ability' standard . . . does not require perfection on the respondent's part, [but] it does not allow for 'inattentiveness, carelessness, or inadequate record keeping'"), quoting *Nippon Steel Corp. v. United States*, 337 F.3d, 1373, 1382 (Fed. Cir. 2003); *Peer Bearing Co. v. United States*, 766 F.3d 1396, 1400-01 (Fed. Cir. 2014) ("a reasonable importer" should have expected that it would need to maintain its records to report its export price sales data in a remand because that had been an issue in the appeal).

### V.  Determination Not to Verify the HRS for LTAR Program

Borusan briefly contends that the determination not to verify the alleged HRS for LTAR program of the Turkish government was a "plain violation of 19 U.S.C. § 1677m(i)." Borusan Br. at 8 ("Statement of Facts" section).

Commerce responds that it addressed the verification issue in the *IDM* by explaining that it "accepted the accuracy of the information that the [Turkish government] submitted on its face," so therefore verification of the program was not required. *IDM* at 54-55. Commerce further explained that "unless the [Turkish government] planned to provide new factual information at verification or claim that its own submissions were false, then verification would have no effect on the final determination", *id*. at 54, and that "parties may not submit new factual information at verification under the deadlines in 19 CFR 351.301[;] . . . [t]he purpose of verification is to verify the accuracy of information already on the record, not to continue the information-gathering stage

of the Department's investigation[; n]or is verification an appropriate forum for respondents to

present arguments with respect to Department's analyses." *Id.* at 55. With respect to Borusan's

point, Commerce retorts that the contention does not discuss Commerce's analysis and determination

on the verification issue and does little more than briefly mention the verification circumstances in

its brief. *See* Borusan Br. at 8. As such, Commerce argues, any argument Borusan may choose to

make is therefore waived. Def's Resp. at 48, referencing *Thompson v. United States*, 732 F.3d 826,

831 (7th Cir. 2013); *San Martin v. McNeil*, 633 F.3d 1257, 1268 n.9 (11th Cir. 2011); *City of Nephi

v. FERC*, 147 F.3d 929, 933 n.9 (D.C. Cir. 1998).

      "Congress has implicitly delegated to Commerce the latitude to derive verification

procedures *ad hoc*." *Micron Tech. Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997). It

might be true, as Commerce argues, that the statute does not literally require Commerce to verify

"all" information. *Id*. But whether the alleged HRS for LTAR program was an instance that should

have been verified is now moot, as Borusan notes that "[t]he injury that Borusan sustained as a result

of Commerce's unlawful refusal to verify the HRS for LTAR program at the [Government of

Turkey] can no longer be meaningfully remedied." Borusan Br. at 10.

## VI.  Miscellaneous

      In passing, Commerce also notes, as a final matter, that Borusan attached various

letters to its brief that it claims were omitted from the administrative record in this case, *see* Borusan

Br. at 5 n.2 & Ex, 1, and that on November 6, 2014, Commerce filed an amended record with this

Court to add correspondence that it claims had been inadvertently filed only on the record of other

OCTG investigations that referenced this investigation. Commerce states that some of the

documents attached to Borusan's brief were not included because they do not belong on the record

of this investigation, as they refer only to the Korean OCTG investigation and only to concerns about issues specific to those antidumping proceedings. *See*, *e.g.*, Borusan Br. Ex. 1 at 3 (Letter from Robert Brundrett, dated May 22, 2014).   As such, Commerce requests that those documents be disregarded as not contained on the record of this investigation.  The court has done so.  *See Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court").

*Conclusion*

In light of this opinion's issuance, based on the quality of the briefs before the court, and considering the parties' discussion of the plaintiffs' motion for expedited consideration, ECF No. 69, and of the defendant-intervenors' motion for oral argument, ECF No. 70, those motions will be, and hereby are, denied as moot.

For the reasons stated in the opinion, above, this matter must be, and hereby is, remanded to the International Trade Administration, U.S. Department of Commerce, for further proceedings not inconsistent herewith.

Results of remand shall be due July 17, 2015.  As soon as practicable after docketing, the parties shall confer on filing a joint status report or proposed scheduling order for comments, if any, on the results of remand, and the plaintiffs shall apprise the Clerk of the Court of such efforts in writing by close of the fifth business day thereafter.

**So ordered.**

                                                                /s/  R. Kenton Musgrave
Dated:   April 22, 2015                          R. Kenton Musgrave, Senior Judge
             New York, New York