Slip Op. 16 - 16

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| MAVERICK TUBE CORPORATION, | : | |
| Plaintiff, | : | |
| and | : | |
| UNITED STATES STEEL CORPORATION, BOOMERANG TUBE LLC, ENERGEX TUBE (a division of JMC STEEL GROUP), TEJAS TUBULAR PRODUCTS, TMK IPSCO, VALLOUREC STAR, L.P., and WELDED TUBE USA INC., | : | |
| Plaintiff-Intervenors, | : | Before: R. Kenton Musgrave, Senior Judge |
| v. | : | Consol. Court No. 14-00229 |
| UNITED STATES, | : | |
| Defendant, | : | |
| and | : | |
| TOSCELIK PROFIL VE SAC ENDUSTRISI A.S., CAYIROVA BORU SANAYI VE TICARET A.S., BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S., and BORUSAN ISTIKBAL TICARET, | : | |
| Defendant-Intervenors. | : | |

**OPINION**

[Sustaining results of remand of countervailing duty investigation into oil country tubular goods from Turkey.]

Dated: February 22, 2016

*Alan H. Price* and *Robert E. DeFrancesco, III*, Wiley Rein, LLP, of Washington DC, for the plaintiff Maverick Tube Corporation.

*Robert E. Lighthizer*, *Jeffrey D. Gerrish*, and *Nathaniel B. Bolin*, Skadden Arps Slate Meagher & Flom, LLP, of Washington DC, for the plaintiff-intervenor United States Steel Corporation.

*Hardeep K. Josan*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington DC, for the defendant. With him on the brief were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Claudia Burke*, Assistant Director. Of Counsel on the brief was *Scott D. McBride*, Senior Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, U.S. Department of Commerce.

*David L. Simon*, Law Office of David L. Simon, of Washington DC, for the defendant-intervenors Toscelik Profil ve Sac Endustrisi A.S. and Cayirova Boru Sanayi ve Ticaret A.S.

*Donald B. Cameron*, *Julie C. Mendoza*, *R. Will Planert*, *Brady W. Mills*, *Mary S. Hodgins*, and *Sarah S. Sprinkle*, Morris Manning & Martin, LLP, of Washington DC, for the defendant-intervenors Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Istikbal Ticaret.

Musgrave, Senior Judge: This opinion addresses the results of remand ("Remand Results" or "RR") filed by the International Trade Administration, U.S. Department of Commerce ("Commerce"), on the underlying consolidated case, familiarity with which is presumed. As discussed below, the Remand Results are supported by substantial evidence and in accordance with law.

By way of brief background, the products that concerned the final affirmative countervailing duty ("CVD") investigation are oil country tubular goods ("OCTG") from Turkey, in particular the alleged state provision of hot-rolled steel for less than adequate remuneration ("LTAR") and other state benefits in the production thereof. *See Certain Oil Country Tubular Goods From the Republic of Turkey*, 79 Fed. Reg. 41964 (July 18, 2014), PDoc 369, and accompanying issues and decision memorandum (July 10, 2014) ("*IDM*"), PDoc 363, (collectively

"*Final Determination*"); *see also* 19 U.S.C. §1677(5). The period of investigation is January 1, 2012, through December 31, 2012 ("POI").

Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Istikbal Ticaret (together "Borusan") filed the first appeal of the *Final Determination*. *See* Court No. 14-00214. Opposing consolidation with the other lawsuits challenging the investigation filed thereafter, Borusan also filed a "motion to expedite briefing and consideration." *Id.*, ECF No. 7 (Sep. 10, 2014). The filing of a joint proposed scheduling order, to which the defendant had consented, mooted acting on the motion to expedite briefing, *see id.*, ECF No. 11 (Sep. 17, 2014), and motions to intervene in that action were filed thereafter and duly acted upon in the order received, *see id.*, ECF Nos. 30-33 (Sep. 29, 2014).

Issuance of slip opinion 15-36 in due course remanded to Commerce and obviated acting on the motion for expedited consideration.[1] *See Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 39 CIT ___, 61 F. Supp. 3d 1306 (2015) ("*Borusan*"). In the court's opinion, substantial evidence of record appeared to support Commerce's determination that HRS suppliers Eregli Demir ve Celik Fabrikalari T.A.S. ("Erdemir") and its subsidiary Iskenderun Demir ve Celik A.S. ("Isdemir") were government "authorities" for purposes of the CVD statute, but further consideration of the finding that the Turkish HRS market was distorted as well as the application of adverse facts available ("AFA") with respect to reported HRS purchases by Borusan was remanded as necessary. *See generally* 39 CIT at ___, 61 F. Supp. 3d at 1324-49; *see also* 19 U.S.C. §§

---

[1] In particular, issuance of that opinion also obviated that motion's proposed order's peculiarity, *i.e.*, having the court order itself to consider the case on an expedited basis, whereas the timing of today's opinion reflects the consideration associated with the knottiness of certain issues after remand.

Consol. Court No. 14-00229                                                                                          Page 4

1677e(a) and (b). Also remanded were several other issues related to benefit measurements under 19 C.F.R. §351.511(a)(2)(iv), the further consideration of which depended upon the Turkish HRS market's level of distortion. *See* 61 F. Supp. 3d at 1337.

Subsequently, *Maverick Tube Corp. v. United States*, 39 CIT ___, Slip Op. 15-59 (June 15, 2015) ("*Maverick*"), addressed the similar claims of the domestic industry litigants and the respondent Toscelik Profil ve Sac Endustrisi A.S. ( together with Cayirova Boru Sanayi ve Ticaret A.S., "Toscelik") separately filed here against the HRS-for-LTAR aspect of the investigation into OCTG from Turkey as well as Toscelik's claim against the agency's benchmark for valuing a parcel of land that the Government of Turkey ("GOT") had granted to Toscelik in 2008 for LTAR (the "Osmaniye Parcel"). *See generally* Slip Op. 15-59. *Maverick* adopted *Borusan* in remanding the same or similar issues, and the two cases were consolidated during remand.[2]

In the Remand Results before the court, Commerce reversed its prior position regarding market distortion under protest and used tier-one (*i.e.*, actual) transaction prices in Turkey as a benchmark to calculate the benefit from the provision of HRS for LTAR to Borusan and Toscelik during the POI. RR at 18, 46. As a result, Commerce deemed the remaining benefit-related matters that had been remanded no longer relevant and did not address them further in the Remand Results.[3] *See* RR at 3. Commerce again insisted that applying partial AFA to Borusan was proper. *See id*. at 7-8, 19-28. Lastly, Commerce adjusted the Osmaniye Parcel benchmark. *Id*. at 3. The parties argue for further remand, as follows.

---

[2] *See*, *e.g.*, Court No. 14-00214, ECF No. 85 (June 22, 2015).

[3] As an aside, Commerce confirmed on remand that *Borusan*'s "interpretation is an accurate statement of Commerce's meaningful control standard," which no party challenges. *See* RR at 12.

Consol. Court No. 14-00229                                                                                      Page 5

I

The domestic industry representatives, Maverick Tube Corporation ("Maverick") and United States Steel Corporation ("U.S. Steel"), argue that the Remand Results' analysis of market distortion is not adequately explained. Their arguments may be summarized as putting the onus on the Government of Turkey ("GOT") for the state of the record, which "precluded" Commerce from finding the Turkish HRS market distorted, because the GOT did not provide data on Erdemir's and Isdemir's share of HRS production and consumption in Turkey. The domestic industry thus argues Commerce erred in not applying AFA.

Restating parts of the Remand Results, U.S. Steel argues "there is no question that the GOT failed to cooperate to the best of its ability by failing to provide the information requested by Commerce regarding the HRS market in Turkey." U.S. Steel Cmts at 5-6. Maverick also criticizes Commerce for accepting "without scrutiny or explanation" the GOT's statement that "confidentiality requirements" related to Turkey's European Union relationship and businesses precluded submitting documentation underlying the GOT's National Restructuring Plan, and Maverick insinuates that the GOT did not treat that documentation as confidential "when they formed the basis of [the GOT's] position paper" or distinguish information in these documents from the types of information regularly submitted as confidential under the protection of an administrative protective order in Commerce's investigations. Maverick Cmts at 8.

Regarding the averment that Commerce was not "direct[ed] to reassess the GOT's failure to provide HRS production data[ ] and on that basis presume as adverse facts available that the HRS market is distorted", Maverick Cmts at 4, quoting RR at 31, Maverick first notes that this

is true only insofar as the remand orders did not direct Commerce to reconsider the record in any particular manner or to reach any particular conclusion, which is correct,[4] and that Commerce was also requested "to explain those circumstances where 'substantial portion of the market' results in minimal distortion and where it results in substantial or significant distortion and explain its reasoning on its categorization of the matter at bar and the record evidence that supports it", *id.*, quoting *Borusan*, 61 F. Supp. 3d at 1330. Maverick argues the Remand Results attempt this exercise "but fail for the explicit reason that the GOT did not provide necessary information despite Commerce's repeated requests." *Id.*, referencing RR at 14.

        The court does not discern where in the Remand Results that exercise is attempted. Be that as it may, Commerce obviously casts doubt on the GOT's responsiveness by calling into question whether the GOT was actually in possession of the kind of production and consumption data requested or could mandate its procurement, and Maverick and U.S. Steel go further, arguing that the GOT actually was in possession. However, the assumption that underlies their arguments is that the GOT in fact maintained, or had access to, the level of such data that would be meaningful to this investigation. Speculation is not substantial evidence. *See, e.g.*, *Asociacion Columbiana Exportadores de Flores v. United States*, 23 CIT 148, 153-54, 40 F. Supp. 2d 466, 472 (1999). *Cf. Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1572 (Fed. Cir. 1990) (Commerce may not "characterize a party's failure to list and give details of sales as a 'refusal' or 'inability' to give an answer where, in fact, there are no sales").

---

    [4] As stated in *PPG Industries* on a similar contention, "it is equally true that that order did not restrict the agency from doing so. Indeed, the intent of the remand was to permit maximum administrative flexibility." *PPG Indusries v. United States*, 15 CIT 632, 637 (1991).

In the final analysis, Commerce did not find dispositive evidence of market distortion on the record, and the parties do not point to anything of record to indicate that the GOT was not being truthful in stating that it could not provide production and consumption data for HRS. Maverick insists, however, that the record belies the GOT's claim of "confidentiality requirements." Maverick Cmts at 8, referencing PDocs 272-79 at 3-4. The argument is underdeveloped, and examination of that portion of the record does not reveal contradiction. In particular, Maverick does not explain why either the GOT's claim could not have been construed as comporting with 19 C.F.R. §351.304 or may have been improperly considered privileged information pursuant to 19 C.F.R. §351.105(d). Furthermore, whether the parties' aspersions accurately characterize what transpired during the investigation, they do not lead to the conclusion that the application of AFA against the GOT is the proper remedy at this point, given Commerce's treatment thereof at that time and since. *Cf.*, *e.g.*, *Essar Steel Ltd. v. United States*, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1297 (2010) ("[w]here the foreign government fails to act to the best of its ability, Commerce will usually find that the government has provided a financial contribution to a specific industry") (citation omitted).[5] Hence, notwithstanding the Remand Results' narrative regarding the GOT's responsibility for the state of the record, substantial evidence of record supports the Remand Results on the issue of market distortion.

---

[5] The court also notes Borusan opposing the implication in the Remand Results that *Borusan* affirmatively supports use of a *per se* market distortion rule in any case in which the government supplier accounts for a majority of the market, Borusan's Cmts at 14-17, but any comment here on that, at this stage, would amount to an advisory opinion.

II

Regarding the application of partial AFA to Borusan's questionnaire responses on its HRS purchase information, the relevant regulation, 19 C.F.R. §351.525(b)(5), provided during the POI that "[i]f a subsidy is tied to production or sale of a particular product, the Secretary will attribute the subsidy only to that product", but "[i]f a subsidy is tied to production of an input product" such as HRS, "then the Secretary will attribute the subsidy to both the input and downstream products produced by a corporation." In retrospect, it is apparent that remand of the issue engendered interpretive difficulty.

A

The Remand Results elaborate somewhat on Commerce's attribution practice, beginning with restatement that Commerce's regulatory practice is to regard the provision of an input for LTAR as benefitting a company's overall production absent a requirement explicitly made at the time of "bestowal," *i.e.*, when the terms for the provision are set, that the input may only be used for a certain subset of a company's production. Commerce's "tying rules are an attempt at a simple, rational set of guidelines" for addressing the kind of "attribution-related issues" that arise when considering fungible inputs. *See* 19 C.F.R. §351.525(b)(5). *Cf.* RR at 20, quoting *Countervailing Duties*, 63 Fed. Reg. 65348, 65403 (1998) ("*CVD Preamble*").

Thus, pursuant to practice, Commerce seeks purchase information for all procured input being investigated for LTAR regardless of whether the input is for incorporation into subject or non-subject merchandise. RR at 20-22, referencing, *inter alia*, *Certain Kitchen Shelving and Racks from the People's Republic of China* ("*PRC*"), 74 Fed. Reg. 37012 (July 27, 2009) (final

affirmative CVD determ.) ("*Kitchen Racks from the PRC*") and accompanying issues and decisions memorandum (such memoranda hereinafter "I&D Memo") at cmt. 10 ("[g]iven the breadth of product line . . . and the wide variance of Wire King's use of wire rod in its products, we do not find that the GOC intended to benefit specific . . . products"). "Absent a determination that a subsidy is tied to a specific product under 19 CFR 351.525(b)(5), Commerce does not limit the attribution of a benefit from a subsidy program to a specific product." RR at 23, quoting *IDM* at 53 (internal quotations and bracketing omitted). More precisely, Commerce will only consider a subsidy tied to a particular product when it is specifically earmarked to that product by the foreign government. *See id*. at 20.

The Remand Results also restate Commerce's position on the administrative record of Borusan's responses to the two administrative requests for information on Borusan's HRS input procurement. By way of brief background, Commerce first requested Borusan's HRS input information pursuant to its general practice. Borusan's first response did not provide all the information Commerce requested; instead, Borusan provided the information that Borusan believed would suffice for purposes of calculating the CVD margin for its subject merchandise. Commerce's supplemental questionnaire repeated its request for all HRS purchase information and also requested that if Borusan is unable to provide this information then Borusan should explain in detail why it cannot do so and explain the efforts made to obtain the information. Borsuan responded by providing a more elaborate explanation of the difficulties it had encountered in obtaining the Gemlik mill information, in particular the fact the information was in disparate systems and had to be extracted manually, that the Gemlik plant information alone, which was the only plant dedicated to

production of subject merchandise, had amounted to over 300 pages of detail, and had taken over two weeks involving numerous personnel. By "provid[ing] in the alternative"[6] the full reporting of HRS purchase information for the Gemlik plant, Borusan asked Commerce to relieve it of the burden of having to produce the HRS purchase information for the other two plants pursuant to 19 U.S.C. §1677m(c). Borusan also stated that if Commerce truly needed the information for the non-subject merchandise producing plants, Borusan stood ready to provide it but that it would take several weeks to provide. *See generally* CDocs 136-37 at 8-11. For the remainder of the administrative review, Commerce was silent on the matter, and for its *Final Determination* it applied partial AFA to Borusan's responses.

B

Given Commerce's silence, and since it was unclear to the court why Commerce still considered that information necessary to its *Final Determination*, *cf. CVD Preamble*, 63 Fed. Reg. at 65403 (explicitly rejecting "fungibility" as "the guiding principle for attributing subsidies"), the matter was remanded with the intention of clarifying whether insistence upon adherence to administrative practice was only an excuse for resorting to facts available pursuant to 19 U.S.C. §1677e in order to impose an adverse inference in the selection thereof at the time the *Final Determination* was made. Unfortunately, given the timeline of the relevant events, the opinion's commentary may have clouded the issue.

For example, defense of the Remand Results veers into argument that 19 U.S.C. § 1677e(a) does not require that information be "necessary," only "reasonable," in order for Commerce

---

[6] CDocs 136-37 at 10.

to "act[ ] well within its discretion" when seeking information, and that "an interpretation of the statute to require that Commerce establish that all information that it requests is 'necessary' effectively reads subsection (2) out of the statute entirely." *See, e.g.*, Def's Resp. to Cmts at 12-13, referencing RR at 30, *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001), *Loughrin v. United States*, 134 S. Ct. 2384, 2390 (2014), *Olympic Adhesives, Inc. v. United States*, 899 F.2d 1565, 1572 (Fed. Cir. 1990), *Ningbo Dafa Chem. Fiber Co. v. United States*, 580 F.3d 1247, 1254 (Fed. Cir. 2009) and *Ad Hoc Shrimp Trade Action Comm. v. United States*, 802 F.3d 1339, 1353 (Fed. Cir. 2015) (recognizing a distinction between subsections (a)(1) and (2)). *Borusan*, however, did not impose such an interpretation of the statute; it was the *Final Determination*'s own statement (*i.e.*, that the application of AFA to Borusan rested on the absence of "necessary" information and the purported "withholding" of that information) that prompted the expressed opinion.

   The parties also argue over the "tying" exception in 19 C.F.R. §351.525(b)(5) rather than focus on the point of the remand. Borusan, for example, argues that its purchases of HRS for the Gemlik plant were indeed "tied," and it distinguishes its circumstance from cases claimed in the Remand Results as support for Commerce's position, in particular *Steel Wire Strand from the PRC*.[7]

---

[7] *See Kitchen Racks from the PRC*, I&D Memo at cmt. 10 (rejecting petitioner's request "to tie the benefit from Wire King's purchases of preferentially priced wire rod only to purchase made with wire rod"); *Drill Pipe from the PRC*, 76 Fed. Reg. 1971 (Jan. 11, 2011) (*inter alia*, final affirmative CVD determ.) ("*Drill Pipe from the PRC*"), and accompanying I&D Memo at cmt. 6 (rejecting petitioners' request to tie benefit to particular products because "their position on a product classification [ ] simply groups together different products that use a common material input" and the input at issue was used in the production of various products); *Circular Welded Austenitic Stainless Pressure Pipe From the PRC*, 73 Fed. Reg. 39657, 39663-64 (July 10, 2008) (*inter alia*, prelim. affirmative CVD determ.) ("*Pressure Pipe from the PRC*") at "Provision of Stainless Steel Coil for LTAR" (rejecting respondents' argument that stainless steel coils should not be subject to LTAR subsidy analysis where the inputs are "not . . . incompatible with the production process");
(continued...)

However, there is no indication in the record that the HRS was "tied" to either subject or non-subject-merchandise in the sense contemplated by 19 C.F.R. §351.525(b)(5) apart from the fact that shipments of HRS to Gemlik from Erdemir and Isdemir were "destined for" Gemlik. For instance, it does not appear that Erdemir and Isdemir "purposed" the HRS shipped to Gemlik for incorporation only into particular merchandise. For that reason, the court must conclude the Remand Results reasonably explain that provision of the HRS purchase information for the non-subject merchandise producing plants was "necessary" in the sense contemplated by Commerce's general regulatory practice.

Nonetheless, Borsuan argues that the Remand Results do not explain how in the final analysis of the facts of this case Commerce could lawfully determine that the HRS delivered to the Halkali and Izmit mills constitutes a subsidy with respect to the manufacture, production, or export of subject OCTGs in accordance with 19 U.S.C. §1671(a)(1). As previously explained, that position

---

[7] (...continued)
*Pre-Stressed Concrete Steel Wire Strand from the PRC*, 75 Fed. Reg. 28557 (May 21, 2010) (final affirmative CVD determ.) ("*Steel Wire Strand from the PRC*"), and accompanying I&D Memo at 10 (discovering at verification of unreported data and refusing to accept respondents' justification that other factories "did not use the wire rod they purchased during the POI to produce PC strand," therefore issue of whether respondents did not have the capability to produce the subject merchandise was not reached). Borusan argues that unlike *Steel Wire Strand from the PRC*, where Commerce discovered at verification that the respondents had not reported wire rod purchases for two factories, Borusan had explained to Commerce four and a half months before Commerce's post-preliminary analysis of this case via its original and supplemental responses that the Halkali and Izmit plants do not produce the subject merchandise and were not at the time capable of producing the subject merchandise. PDoc 75 at 11; PDoc 218 at 8-11. Borusan also argues that it explained it did not transfer any HRS from these plants to the Gemlik plant that produces the subject merchandise, *see* PDoc 75 at 11 & PDoc 218 at 10, and that Commerce never contested these facts. Borusan's Cmts at 6-7.

is not unreasonable even though it is at odds with Commerce's interpretation of the statute in its regulation.

On the one hand, most importantly, Commerce had the actual HRS purchase information for the Gemlik plant that pertained to all of "Boruan's" subject merchandise, which was the main point of questioning why the non-subject-merchandise-producing plants' information was "necessary" *for the Final Determination*. Assuming it is reasonable to presume that a company as a whole benefits from the fungibility of a monetary benefit, such as the purchase of an input-for-LTAR, then if Commerce had received the "missing" HRS purchase information for the non-subject-merchandise producing plants and had calculated a company-wide benefit that it then attributed (back) across subject and non-subject merchandise that was produced at other plants, it was (and still is) unclear to the court whether that result would be any more accurate than attributing to the subject merchandise a calculated "company-wide benefit" consisting of the HRS purchases for the HRS that was *actually* procured at identifiable prices and was *actually* incorporated into subject merchandise that could be attributed to said subject merchandise.[8]

The only difference having the HRS purchase information for the non-subject merchandise producing plants (which are geographically and conceptually distinct from the Gemlik plant) would make is if there are measurable purchase price differences in HRS procurement. In

---

[8] *See Borusan*, 39 CIT at ___, 61 F. Supp. 3d at 1347 ("[i]n other words, at that point, and assuming the truth of Borusan's claims regarding subject merchandise and non-subject merchandise production survived verification, Commerce's 'attribution' would wind up at exactly at the point that Borusan had been making all along to Commerce: that the HRS purchase information for the non-subject-merchandise-producing Halkali and Izmit mills is not relevant to the *attributable* HRS for LTAR in the countervailing duty investigation of oil country tubular goods from Turkey") (italics in original).

such a circumstance, determining the average price of all "company-wide" input-for-LTAR procurement and "attributing" the "benefit" across all production utilizing the input-for-LTAR potentially produces a "fuzzier" result for the relevant subject merchandise than a record that can account for the price of the HRS that is actually incorporated into (and therefore attributable to) the subject merchandise.[9] In other words, differently priced input-for-LTAR provide different levels of benefit(s) to the company, so insistence upon application of a "company-wide" attribution average would conceptually distort the record of the actual benefit of the actual cost of the input that generally accepted cost accounting principles would attribute to account for the input's actual incorporation into subject merchandise -- either away from that merchandise, or *vice versa* in the case of non-subject merchandise. Either instance would not appear to comport with 19 U.S.C. §1671(a)(1). *Cf.* 19 C.F.R. §351.525(b)(5)(i) ("tied to the production or sale of a particular product"). And that, in a nutshell, is Borusan's argument.

On the other hand, the question before the court is whether Commerce's determination is supported by substantial evidence and in accordance with law. And on that question, the court must defer to Commerce's methodology if it is reasonable. *See, e.g.*, *GPX Int'l Tire Corp. v. United States*, 37 CIT ___, ___, 893 F. Supp. 2d 1296, 1329 (2013), *aff'd*, 780 F.3d 1136 (Fed. Cir. 2015). The Remand Results explain that Commerce's tying inquiry is meant to balance the fact that "money" is fungible with the congressional attempt to "attribute" subsidies to

---

[9] Analogous to the physically distinct HRS shipped from Erdemir to the geographically separate Gemlik and non-subject merchandise producing plants is the fact that U.S. Customs and Border Protection explicitly lists the "specific identification method" as one of its recognized inventory management systems for the handling of fungible goods for identification of the good's country of origin. *See* 19 C.F.R. §102.12(b) & Pt. 181, Appx. (*NAFTA Rules of Origin*), Sec. 7(16) & Sch. X. §13.

the products directly benefitting from the subsidy. RR at 40. The court must conclude the general attribution practice not unreasonable *per se*, because aggregating a company's discrete purchases of a subsidized fungible input into one "company-wide" benefit is not inconsistent with the statute. The statute is ambiguous on that point, and Commerce's interpretation of ambiguity in the statute it is charged with administering is entitled to *Chevron* deference. *See United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009); *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842-45 (1984). *Cf.* 19 U.S.C. §1671(a)(1) ("a countervailable subsidy *with respect to* the manufacture, production, or export of a class or kind of merchandise") (italics added).

      Regardless, as the domestic industry correctly points out, the application of AFA is the ultimate issue here, not Commerce's input-attribution practice in general. On the AFA issue, however, Commerce's attribution practice is not irrelevant, because Commerce also has the discretion to deviate from practice if circumstances warrant. *Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003). Taking into consideration the entirety of the above, thus, it was (and, again, still is) unclear what "attribution-related issue" remained after Borusan had submitted its first and supplemental questionnaire responses providing all HRS purchase information for the only plant that produced subject merchandise and explaining its circumstance and the difficulty it had encountered in gathering the HRS information even for just that plant. *Cf.* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1, at 869 (1994) ("Section 776(a) makes it possible for Commerce . . . to make [its] determination[ ] within the applicable deadlines if *relevant* information is missing from the record") (italics added), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198. Nonetheless, the Remand Results necessarily imply that Commerce, when making its *Final Determination*, concluded that Borusan's

circumstances did not compel deviation from Commerce's company-wide input information demand practice. Whether that was an afterthought, the court is precluded from "displac[ing] the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).

C

Borusan also contends that even if the information was "necessary" in accordance with Commerce's practice, there was no basis to apply an adverse inference when selecting among the facts otherwise available. Borusan's Cmts at 4. In accordance with the foregoing, however, there was a basis.

Although, and as previously indicated, the court has substantial doubts on whether Commerce properly informed Borusan of the "nature" of the original questionnaire response's deficiency in the spirit of 19 U.S.C. §1677m(d),[10] once again it is Commerce's interpretation of ambiguous portions of the statute it is tasked with administering that is entitled to *Chevron* deference, *see supra*, not an independent *de novo* opinion on the subject, and the "nature of the deficiency" would certainly encompass informing that a response to a questionnaire did not provide

---

[10] *Cf.* PDoc 177 at 4-5 *with American Tubular Products, LLC v. United States*, 36 CIT ___, Slip Op. 14-116 at 20 (2014) (19 U.S.C. §1677m(d) "ensures that Commerce's data collection does not morph into an administrative guessing game, where the agency punishes parties for giving incomplete answers to cryptic questions"), referencing *Bowe-Passat v. United States*, 17 CIT 335, 342 (1993). In that spirit, simply pointing to "practice" and stating the obvious (that Borusan's original questionnaire response did not provide all the HRS information requested) and requesting Borusan to provide the missing information and explain its efforts to provide it, is hardly a "question" that fully addressed Borusan's original response, as it does not indicate clear acknowledgment and rejection of Borusan's request to be allowed to submit only the Gemlik plant HRS purchase information.

all requested information, even if it did not provide a straightforward answer on Borusan's request to be relieved of providing information that seemed unnecessary to the *Final Determination* on the investigation of HRS-for-LTAR in the subject merchandise OCTGs. *See* 19 U.S.C. §1677m(d) ("If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency"). To require more, however, would intrude into Commerce's province.

It is true, as Borusan argues, that the observation in the prior opinion that the application of an adverse inference does not appear warranted in this case did not hinge on the "necessity" of the HRS purchase information for the Halkali and Izmit plants, as the opinion was based on the record of Commerce's and Borusan's communications during the investigation. Nonetheless, to the extent Borusan contends that the opinion's observation amounts to a holding or a conclusion of the issue as a matter of law,[11] the argument is inconsistent with the court's standard

---

[11] *See Borusan*, 39 CIT at ___, 61 F. Supp. 3d at 1349 ("it does not *appear* that Borusan's was the type of 'willful' non-compliance that would merit imposition of an adverse inference") (italics added). The Remand Results also stress that a showing of "willfulness is not required" to draw an adverse inference. RR at 24-25, citing *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) ("*Nippon Steel*"). However, *Borusan* did not hold that Commerce was required to find willfulness in order draw an adverse inference, the opinion merely drew attention to Commerce's own argument in relief against the record in that regard, and Borusan highlights the prior opinion's recognition that willfulness is not required by calling attention to that opinion's albeit subtle reference, *via Mukand, Ltd. v. United States*, 767 F.3d 1300 (Fed. Cir. 2014), to *Nippon Steel* -- the very case relied upon by Commerce. *Cf. Borusan*, 39 CIT at ___, 61 F. Supp. 3d at 1346, citing, Def's Resp. in Ct. No. 14-00214, ECF Doc. No. 52 (Jan. 15, 2015), at 45-46, *with Nippon*
(continued...)

of review. In the final analysis, the question is solely whether the agency's determination is supported by substantial evidence on the record and is in accordance with law. 19 U.S.C. §1516a(b)(1)(B)(i).

Notwithstanding that Borusan was left in limbo on its request for relief from Commerce's request for non-subject merchandise producing mills' HRS purchase information, Commerce's request for that information was still outstanding by the time Commerce reached its preliminary determination and Commerce implicitly refused to deviate from its general attribution practice. Substantial evidence of record supports Commerce's conclusion in its *Final Determination* that Borusan had not exerted its best efforts to provide the requested information. *See Nippon Steel*, 337 F.3d at 1382-83. In other words, whether Commerce's inaction upon Borusan's request for relief was arguably abusive, substantial evidence supports that Borusan at least shared if not bore responsibility for the state of the record, *see supra*, and the state of the law does not, apparently, require more of Commerce. *Cf. Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1275-76 (Fed. Cir. 2012) (quoting *Nippon Steel*, 337 F.3d at 1382: "[c]ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation"), *with Ansalado Componenti, S.p.A. v. United States*, 10 CIT 28, 37, 628 F. Supp. 198, 205 (1986) ("[i]t is Commerce, not the respondent, that determines what information is to be provided" *et cetera*).

---

[11] (...continued)
*Steel Corp*. 337 F.3d at 1383 (holding that while there is no requirement to find motivation or intent in order to draw an adverse inference, "[a]n adverse inference may not be drawn merely from a failure to respond, but only under circumstances in which it is reasonable for Commerce to expect that more forthcoming responses should have been made"). Precisely so.

III

Toscelik previously persuaded that in order to value its Osmaniye Parcel, for its *Final Determination* on the investigation of OCTG from Turkey Commerce had "merely adopted" the 2011 administrative review results of the CVD order on circular welded carbon steel pipes and tubes from Turkey ("CWP from Turkey"). *Maverick*, Slip Op. 15-59 at 12. The court concluded that the *post-Toscelik*[12] final results of those reviews implicated the benchmark valuation of the Osimanye Parcel and remanded for correction thereof. *Id*. Commerce complied in the Remand Results. RR at 28.

U.S. Steel contends the revision of the benchmark should be overturned, arguing that establishing the amortization schedule for the Osmaniye Parcel during the 2010 administrative review of *CWP from Turkey* may have had binding consequences on the subsequent 2011 review of that product but is not binding and has "no application" in this separate OCTG from Turkey investigation. U.S. Steel emphasizes that for *OCTG from Turkey*, Commerce revised its valuation by expanding the number of data points for the benchmark in order to "build the most robust data set possible" as "the more commercial transactions within Turkey that [Commerce] uses as part of its benchmark analysis, the greater the likelihood that the benchmark will accurately reflect the experience of commercial land purchasers in Turkey." U.S. Steel Cmts at 18, quoting *IDM* at 58, PDoc 363. U.S. Steel contends this makes the benchmark "more accurate" and "there is no reason not to make the calculation more accurate in a completely separate CVD proceeding. Indeed, failing

---

[12] *See Toscelik Profil ve Sac Endustrisi A.S. v. United States*, 38 CIT ___, Slip Op. 14-126 (Oct. 29, 2014) ("*Toscelik*").

to recalculate the benefit in this case simply perpetuates the inaccuracy of the calculation in a separate case based on a principle that has no application." *Id*. at 18-19.

In other words, U.S. Steel argues that the 2010 and 2011 land benefit calculations in *CWP from Turkey* are properly characterized as "inaccurate" and it thereby impugns the validity of the 2010 and 2011 (*post-Toscelik*) administrative reviews of *CWP from Turkey*. After re-reading the prior opinion and the relevant potion of the *IDM* for the original determination of this proceeding in accordance with U.S. Steel's arguments, the court continues to conclude that a consistent Osmaniye Parcel benchmark value across proceedings is necessary. *Cf.*, *e.g.*, PDoc 140 *with* RR at 57 ("[o]ur calculation of a simple average is *consistent with* the Department's calculation of the land benchmark in *CWP from Turkey* 2011 AR") (italics added; footnote omitted). U.S. Steel does not persuade that error is manifest in Commerce's benchmark valuation of the Osmaniye Parcel and/or the amortization schedule thereof as established in *CWP from Turkey* through appeal thereof, and in the absence of such a showing a disparate valuation of that same parcel of land as a final result of *this* proceeding would be odd indeed.

*Conclusion*

In accordance with the foregoing, the Remand Results must be sustained, and judgment to that effect will be entered.

/s/  R. Kenton Musgrave
R.  Kenton Musgrave, Senior Judge

Dated:  February 22, 2016
       New York, New York